## CORBETT v. SCHLUMBERGER WELL SURVEYING CORPORATION.

### Civil Action No. 570.

District Court, S. D. Texas,
Houston Division.

Feb. 17, 1942.

George P. Kirkpatrick and Ne Cochran, both of Houston, Tex., for plaintiff.

606

Baker, Botts, Andrews & Wharton and J. C. Hutcheson, III, all of Houston, Tex., for defendant.

Douglas W. McGregor, U. S. Atty., and Brian S. Odem, Asst. U. S. Atty., both of Houston, Tex., Warner W. Gardner, Sol., Irving J. Levy, Associate Sol., and Erwin B. Ellmann, Atty., all of Washington, D. C., and Llewellyn B. Duke, Regional Atty., Wage and Hour Division, U. S. Department of Labor, of Dallas, Tex., for intervenor, United States of America.

KENNERLY, District Judge.

This is a suit by Plaintiff, J. Corbett, a former employee of Defendant, Schlumberger Well Surveying Corporation, to recover for alleged unpaid overtime during the period from "about" November 1, 1938, to January 15, 1941, and penalty and attorney's fee under the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201 to 219. Defendant's defense is that Plaintiff and Defendant and their contractual relations do not come within the scope of the Act and particularly Sections 3 and 7 thereof, that Defendant is a service establishment within the meaning of Section 13 of the Act, that any claim of Plaintiff for overtime worked prior to August 7, 1939 (two years before the filing of this suit), is barred by the Texas Two Year Statute of Limitation, Vernon's Ann.Civ. St.Tex. art. 5526, that Defendant paid Plaintiff more money during the period of time involved in this suit than Defendant was required to pay him under such Act, and that the hours of labor of Plaintiff during part of said period of time were within the control of the Interstate Commerce Commission under Section 13 of the Act. Defendant also questions the constitutional validity of portions of the Act if given certain constructions, and the Government of the United States of America has, by permission of the Court, intervened, Title 28 U.S.C.A. § 401.

The facts have been stipulated. No good purpose would be served by quoting herein the Stipulation in full, but it is referred to and quoted from as necessary.

1. All of Plaintiff's claim for overtime which accrued more than two years before the filing of this suit is barred under the Texas Two Year Statute of Limitation. Klotz v. Ippolito, D.C., 40 F.Supp. 422.

2. The applicable portion of Section 7 of the Act, 29 U.S.C.A. § 207, is as follows: "(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce" etc.

It is doubtful if Plaintiff's Complaint, when fairly construed, charges that either Defendant or its employees were, during such period, engaged "in commerce", but rather that they were engaged "in the production of goods for commerce." The Stipulation and the Briefs, however, bring on for discussion both questions. Many cases have been cited by the parties, the latest being the controlling case of Warren-Bradshaw Drilling Co. v. Hall et al., 5 Cir., 124 F.2d 42, 43. In that case, the employer (Warren-Bradshaw Drilling Company) was called a drilling contractor, and was engaged with rotary drilling machinery and equipment in the business of drilling oil wells, not for itself, but for others upon leases of others. Employees (Hall et al.) suing for overtime under the Act were members of the drilling crew. The Opinion sets forth part of a summary of the facts by the Trial Judge, which I quote: " 'The defendant [Employer] was not the owner of any of the leases worked upon. It was simply under contract for such owners to drill the wells. It had nothing whatever to do with the wells, or holes in the ground, other than above indicated. When it finished such work, it would move to another location and commence another well, and so on, * * *' 40 F.Supp. 272. 'As a practical matter, in the drilling of these oil wells, the defendant used rotary rigs for drilling the wells down to, or near to, the pay sand. At that juncture, the rotary crews would cement the casing at or near the expected pay sand, and then would withdraw all the rotary machinery and another crew would move in and complete the well, bring it in, or demonstrate that it was a dry hole, with cable tools. In other words, plaintiffs here [Employees] did not do the whole job, but it was finished by the cable tools crew. That is true with respect to every well on which the plaintiffs worked that is involved in this suit.' "

In this case, Defendant Schlumberger Well Surveying Corporation was engaged, with crews of men and patented mechanisms belonging to it, in the business of logging wells and in the business of perforating the casing of wells drilled for the production of oil or gas, not for itself, but

for others upon the leases of others. Plaintiff Corbett was, except as hereinafter mentioned, from time to time, a member of one of its crews. Defendant had no interest in the wells upon which it and Plaintiff and its other employees worked, nor in the land or leases upon which the wells were located. The Stipulation describes the processes[1] used by Defendant, and I quote in part therefrom (italics supplied):

"Defendant, Schlumberger Well Surveying Corporation at all times material to this suit rendered various services to persons and companies engaged in drilling for and producing crude oil and gas. Two of these services are pertinent to this case. (By the use of the term 'services' in these stipulations, plaintiff and intervenor do not agree that defendant is a service establishment within the meaning of Section 13(a)(2) of the Fair Labor Standards Act of 1938.) They are known as *electrical well logging* and *precision gun perforating*.

"Electrical logging consists of measuring the electrical resistivity and electrical porosity of formations penetrated by a drilled hole by means of a device lowered into the hole on a cable containing insulated conductors.

"A current of constant intensity is transmitted through the ground, and by means of recording mechanisms connected to the electrical circuit the electrical resistivity of the rock (the reciprocal of conductivity) is measured. The log chart obtained as the electrode is lowered into the bore hole or withdrawn therefrom, shows a continuous record of the resistivity of the strata in that part of the hole under examination. Electrical porosity measurements of formations are obtained by measuring the differences of electrical potential which spontaneously take place at the contact between the porous strata and the fluid in the drill hole. The spontaneous currents result mostly from infiltration of the drilling mud fluid into the porous strata. The currents are generated at the depth of the pervious layers, therefore the porosity log shows peaks opposite sand formations and flat curves opposite less pervious beds. Both the resistivity and porosity diagrams are recorded simultaneously. The information obtained by electrical logging gives a complete and consecutive record of formations penetrated and logged in a drill hole. As the diagrams are obtained directly at the well, results can be interpreted immediately after the survey.

"A well is in exactly the same physical condition after it has been logged and the logging equipment withdrawn that it was before. Logging is, thus, not a direct physical part of drilling, and it has no direct physical effect on the drill hole, though the information obtained thereby may lead to further drilling operations. Its function and purpose are, as an adjunct to drilling, to obtain information and furnish it to the well operator. It is used to find the oil-bearing strata and by correlation of a series of such logs to ascertain the subsurface characteristics of an entire area. Such logs are used in locating areas for gun perforation in order to tap a given oil-bearing strata, for squeeze-cementing, or for controlled acidizing.

"Electrical logging is the result of comparatively recent inventions but has, nevertheless, been used extensively by the de-

[1] Such processes are referred to by this Court in Schlumberger Well Surveying Corp. v. Halliburton Oil Well Cementing Co., D.C., 41 F.Supp. 345, as follows: "From a time whence the 'memory of man runneth not to the contrary,' humankind have pried into and endeavored to learn the secrets, and harness and utilize the energies, currents, potentials, etc. (by whatever name they may be known, but for brevity here called 'earth currents'), of the earth, both on and below the surface. Beginning with the 'willow switch', the 'divining rod', and the 'doodle bug', and progressing to scientifically recognized and approved methods, the effort has been long and continuous. Now Plaintiff comes into Court and says that given a hole drilled into the ground (generally one drilled in an effort to produce oil or gas), which hole contains water, etc., Plaintiff's Vendor, Conrad Schlumberger, has discovered a scientifically recognized and approved process, and invented an apparatus for carrying out such process, for measuring and recording at different depths the 'earth currents' in the hole, from which record there may be deduced and ascertained the formations of rock, sand, and other substances in such hole and in the vicinity thereof, enabling finally a finding of whether oil, gas, and other minerals exist in proximity to such hole. Plaintiff's process and apparatus is known as an electrical log, and is covered by Application filed June 6, 1929, and Patent No. 1,819,923 issued August 18, 1931, to Conrad Schlumberger and duly assigned to Plaintiff."

fendant in many fields during the last seven years. The percentage of wells logged in areas where electrical logging is used varies widely, ranging in the first half of 1941, from 97.8% in Southern Louisiana to 4.4% in West Texas. There are attached hereto, marked 'Exhibits B-2, B-3, and B-4', tables showing, for six months periods from January 1, 1939 to June 30, 1941, such percentages, as well as the number of wells completed and number of wells logged in each producing area where logging is used. In some areas, notably Pennsylvania, Michigan, Ohio, New York, and West Virginia, no logging was done during the time involved in this suit.

"The general purpose of *gun perforating* is to permit oil to flow from a selected strata into the oil well. This is accomplished by shooting holes through the oil well casing with a perforating gun which simultaneously shoots a number of bullets through the casing. The oil then flows through these holes and is pumped or flows from the well. This process is further described in Exhibit C-10[2] hereinafter referred to. Gun perforating is a comparatively new method of completing oil wells. Defendant first engaged in it in August, 1938."

The following also appears in the Stipulation: "Attached hereto and marked 'Exhibit B-1' is a table showing the various places where plaintiff was stationed during the times material hereto, the various wells on which he worked with the locations thereof, the respective dates on which he worked on each well and the nature of the work performed."

An examination of Exhibit B-1 discloses that Plaintiff worked for Defendant approximately 250 days between November 1, 1938, and January 24, 1940, and was engaged in "electrical well logging" during all such days, except approximately 25 days during which he was engaged in "precision gun perforating." In other words, Plaintiff worked about one-tenth of the time perforating the casing of wells.

The Stipulation shows the following: "There is attached hereto marked 'Exhibit B-5' a table showing, for the month of September, 1941, the number of wells completed in the principal producing districts of the United States, the number perforated and the percentage of the total which were completed by perforation. This percentage is substantially the same as that which was obtained during the period involved in this suit."

Exhibit B-5 shows that out of 1760 wells completed in oil fields in Texas, California, Louisiana, Arkansas, Illinois, and Oklahoma, 365 wells or approximately 20 per cent were perforated.

I also quote from the Stipulation as follows: "During the time plaintiff was in the employ of defendant it was performing the two services referred to above for nearly all the major oil producing companies in the United States and a great many independent producers and drillers, and the parties with which plaintiff was connected performed such services for numerous companies." etc.

In Warren-Bradshaw Drilling Company v. Hall, supra, it is said: "The operator of the rotary drilling rig and the members of his crew, if not engaged in mining for and the production of oil, within the meaning of the act, as actually mining and producing the oil, and we think they were, were certainly engaged in processes or occupations necessary to the production of oil. In the practical operation of the oil business, no one would accept the view that rotary drilling is not a part of the production of oil and that rotary drilling crews are not a part of the field forces actually engaged in its production. Only by the sheerest quibbling could they be excluded from the operation of laws covering such field forces. It must be conceded: That some operations in the oil business as a whole, and some even in preparation for production, are neither operations in the production of oil, nor processes or occupations necessary for the production thereof; and that an extreme construction of the act, bringing all operation in the oil industry under it, would produce a reductio ad absurdum. But this is no argument at all against the conclusion to be drawn here from the undisputed facts that appellant and its employees are engaged generally in mining for and the production of oil in this state, and specifically in a process or occupation the handling of a rotary drilling equipment necessary to the production of oil here."

In view of the conclusion reached on other questions in the case, I find it unnecessary to decide whether Defendant and its employees were or were not engaged in commerce or the production of goods for commerce.

---

[2] Exhibit C-10 describes the process in a more technical fashion.

3. The following appears in the Stipulation (italics supplied): "A few of the wells on which surveys were performed by the parties on which plaintiff was employed were completed as dry holes and the others were completed as commercial producers. From those wells which were completed as commercial producers, *a substantial part of the oil produced or the products thereof were shipped to points outside the State of Texas.* Defendant itself did not drill, own, or operate, oil wells, nor did it buy, sell, or ship crude oil or its products in interstate commerce."

In other words, a part of the production of such wells was intended to move, and did move, in commerce, and a part did not. Or stated differently, the production of part of the wells was intended to move, and did move, in commerce, and a part did not. This is all the Record shows with respect to whether the production from the wells upon which Plaintiff worked was intended to move or did move in commerce. The Exhibits to the Stipulation show the location, name of owner, and date of each well upon which Plaintiff worked, and the nature of the work he did thereon, but nothing as to what became of the production of such wells. Plaintiff, in order to recover, must show whether he was wholly or partly engaged in commerce, and if only partly so engaged, the extent thereof. Plaintiff has not done this, and therefore may not recover. Klotz v. Ippolito, supra; Fleming v. Arsenal Building Corporation, D.C., 38 F.Supp. 207; Jewel Tea Co. v. Williams, 10 Cir., 118 F.2d 202; Super-Cold Southwest Co. v. McBride, 5 Cir., 124 F.2d 90; White Motor Co. v. Littleton, 5 Cir., 124 F.2d 92.

There is or may be one exception to the foregoing, and that was during about six weeks through the Summer and Fall of 1939, when Plaintiff, stationed in one state (at Midland, Texas, and Hobbs, New Mexico), drove one of Defendant's trucks on which its equipment was carried to well locations in another state (New Mexico and Texas). I am convinced, however, that this service, if an exception, came under that part of Section 13(b) of the Act which reads as follows: "The provisions of section 7 [207] shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49; or (2) any employee of an employer subject to the provisions of sections 1–27 of Title 49."

See also Sections 203 and 204 of the Motor Carrier Act, 49 U.S.C.A. §§ 303, 304; West v. Smoky Mountain Stages, D. C., 40 F.Supp. 296; Gerdert v. Certified Poultry and Egg Company, D.C., 38 F. Supp. 964; Gibson v. Wilson & Co., 4 Wage Hour Rep. 259; Taylor v. Terrell Milling Co., 4 Wage Hour Rep. 434.

4. The portion of Section 13 of the Act upon which Defendant relies in its claim that it is a service establishment is as follows: "(a) The provisions of sections 6 [206] and 7 [207] shall not apply with respect to * * * (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

That Defendant is a service establishment within the quoted provisions, I entertain no doubt. It did not sell goods. It sold service. The service sold was service it was able to render because of the patents owned by it and which presumably could not be rendered by any other person. It sold service just as it was held that a detective agency sold service and is a service establishment in Fleming v. Sondock, D.C.S.D.Tex., 43 F.Supp. 339, decided January 21, 1942. See also Super-Cold Southwest Co. v. McBride, supra; Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172; Swift & Co. v. Wilkerson, 5 Cir., 124 F. 2d 176; White Motor Co. v. Littleton, supra; Duncan v. Montgomery Ward & Co., D.C.S.D.Tex., 42 F.Supp. 879, decided December 16, 1941; Prescription House, Inc., v. Anderson, D.C.S.D.Tex., 42 F.Supp. 874, decided December 11, 1941.

The Government strongly combats this view. Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, is relied upon. Also Fleming v. Arsenal Building Corporation, 2 Cir., 125 F.2d 278. Both were cases where the employer owned and operated buildings, space in which was rented to tenants engaged in commerce or in the production of goods for commerce. Such employers were not, as here, selling service, and the line of demarcation between those cases and this is clear. Not so clear, but nevertheless existing, is the line of demarcation between the drilling contractors in Warren-Bradshaw Drilling Co. v. Hall, supra, and Defendant. The Government also relies upon the ruling and interpreta-

610

tions of the Wage and Hour Administrator with respect to what is and what is not a Service Establishment. No ruling or interpretation of the Administrator with respect to establishments substantially similar to that of Defendant has been called to my attention. But if there be such ruling, what is said in Super-Cold Southwest Co. v. McBride, supra, is applicable.

It is, of course, true that in Fleming v. Sondock, supra, all of the servicing of the detective agency was within Texas, while Defendant appears from this record to be servicing in several states. But such servicing is all intrastate in character. They are akin to those of the employer in Duncan v. Montgomery Ward & Co., who owned chain stores and the employees suing were engaged in the store in Houston. Here, the Stipulation (Exhibit B–1) shows Plaintiff to have been stationed and working at times at and around Houston, Texas, at and around Midland, Texas, at and around Hobbs, New Mexico, and at and around Houma, Louisiana, but Defendant's servicing was at each point within the state where Plaintiff was stationed, except those at Midland, Texas, hereinbefore discussed. It is clear that the far greater part of Defendant's servicing was in Intrastate Commerce.

It is not necessary to discuss the other questions raised. From what has been said, it follows that Judgment should be rendered for Defendant.