299 F.2d 37
 OPELIKA ROYAL CROWN BOTTLING COMPANY, A Partnership, and Griffin McGinty, Appellants,
v.
Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Appellee.
Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Appellant,
v.
OPELIKA ROYAL CROWN BOTTLING COMPANY, A Partnership, and Griffin McGinty, Appellees.
 No. 18879.
 United States Court of Appeals Fifth Circuit.
 January 25, 1962.
 
 Bessie Margolin, Asst. Sol., Robert E. Nagle, Atty., Dept. of Labor, Washington, D. C., Charles Donahue, Solicitor of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., Dept. of Labor, Birmingham, Ala., for appellee.
 Wm. Bew White, Jr., John J. Coleman, Jr., Birmingham, Ala., Yetta G. Samford, Jr., Samford & Torbert, Opelika, Ala., T. W. Thagard, Jr., and White, Bradley, Arant & Rose, Birmingham, Ala., of counsel, for appellants.
 Before RIVES and WISDOM, Circuit Judges, and CARSWELL, District Judge.
 RIVES, Circuit Judge.
 
 
 1
 The Opelika Royal Crown Bottling Company, a partnership, and Griffin McGinty, a partner, appeal the determination of the court below, sitting without a jury, that several of their employees are covered by the minimum wage and hour provisions of the Fair Labor Standards Act.[1] In the alternative, they argue that these employees are not subject to the overtime provisions of the Act since they are specifically exempt by section 13(b) (1) of the Act.[2] The Secretary of Labor cross-appeals on the failure of the district court to enter an injunction against further violations by the partnership.
 
 
 2
 On the primary issue of coverage, the facts are not in dispute and are well stated in the opinion of the court below:
 
 
 3
 "The defendants are engaged in the wholesale distribution and sale of soft drink beverages to 600-800 Alabama customers (primarily retailers) from defendants' office and warehouse at Opelika, Alabama, where such drinks are stored until their distribution and sale.
 
 
 4
 "At all times material to this action defendants held franchises issued by Nehi Corporation (Nehi) of Columbus, Georgia, for the beverages distributed and sold by the defendants. From the fall of 1957 until the latter part of October 1960, the defendants purchased substantially all of their requirements for soft drinks from Nehi pursuant to a written agreement entered into with Nehi on July 9, 1957, which was terminable at will by either party and which afforded defendants the right to make soft drink purchases from Nehi upon certain terms, including a requirement that defendants furnish to Nehi on each occasion of purchase of beverages sound cases and bottles in number equal to those received. Defendants on infrequent occasions purchased their requirements of soft drinks from a bottler at Roanoke, Alabama.
 
 
 5
 "From 1957 until late October 1960, the defendants operated in substantially the following manner: Defendants' soft drink purchases were transported to defendants' Opelika, Alabama, warehouse in defendants' transport truck where the drinks were unloaded by the transport truck driver or by the warehouseman, or both, and placed in the warehouse. Cases of drinks on pallets were removed from the warehouse stock, as needed, by the warehouseman and placed by him adjacent to five route trucks owned and used by defendants in the local distribution of their drinks and were loaded upon the route trucks by the driver-salesmen and their route-helpers. During said period defendants employed approximately five driver-salesmen and 5 route-helpers, in the operation of the local route truck (sic) whose duties in addition to the loading of beverages upon their route trucks involved the distribution and sale of the beverages along their respective local Alabama routes. At the various stops along each route, the route-helper unloaded soft drinks in the amounts ordered at that time by the customer and picked up empty bottles of the type owned by the defendants, as available, and placed them on the route truck after separating out any broken bottles. Following the return of each local route truck to the warehouse, the driver-salesman and his route-helper unloaded the empty bottles and stacked them on pallets placed by the warehouseman. The warehouseman then sorted and separated them and through the use of a fork lift truck stored them in the warehouse. The defendants normally maintained in the warehouse an inventory of some 1,000 to 2,000 cases of beverages and from 1,500 to 2,500 cases of empty bottles. Cases of empty bottles were removed from storage by the warehouseman and loaded upon the transport truck by the transport truck driver or warehouseman prior to each trip to the bottling source. The transport truck, which was used exclusively in the transport of beverages to the warehouse from the bottling source and transportation of empty bottles to the bottler from the warehouse, made from 4 to 6 trips per week during the period involved. The route-helpers performed none of the duties of either the transport driver or warehouseman.
 
 
 6
 "The defendants owned their own bottles and purchased new ones from time to time as needed by them from independent outside sources. None of the bottles owned by defendants were purchased from Nehi and defendants sold none of their bottles to Nehi during the period involved in this action."
 
 
 7
 According to the testimony of defendant McGinty, over 95 per cent of the drinks they distributed during this period were obtained from the Columbus, Georgia, plant. The primary question is whether, under these facts, the warehouseman and the route-helpers are covered by the Act.
 
 
 8
 In Stewart-Jordan Distributing Co. v. Tobin, 5 Cir., 1954, 210 F.2d 427, a case almost directly in point, this Court held adversely to the defendants. There the distributor handled beer, wine and ale in the City of Jacksonville, Florida, which it obtained from an out-of-state supplier. About 25 per cent of the beer and ale was sold in returnable bottles, which were picked up by the distributing trucks from the retail outlets, returned to the distributor's warehouse where they were sorted, and then returned to the out-of-state supplier under a set agreement whereby the supplier agreed to buy all those offered at a fixed price. The Court there held, with Judge Hutcheson dissenting, that the drivers and drivers' helpers on the distributing trucks were covered by the wage and hour provision of the Act, because the empty returnable bottles picked up at the retail outlets were destined for shipment to an out-of-state supplier under a pre-existing agreement and thus were "goods in commerce" within the meaning of the Act. The appellants attack this decision on two grounds: (1) that it is erroneous and should be overruled, and (2) that it is distinguishable from the case at bar.
 
 
 9
 The appellants claim that the Stewart-Jordan case is an erroneous interpretation of the Supreme Court opinion upon which it relied, Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460. Their argument is that the return route of the empty bottles is de minimis and that clearly the distribution of the full bottles is not "in commerce" within the meaning of the Jacksonville case. We agree with the appellant that the distribution of the full bottles is not "in commerce" since they are not ordered from Nehi in accordance with pre-existing orders from customers; the retailers do not make their orders until the distributing truck arrives on its daily route. But this does not mean that the return route may be overlooked. As the Supreme Court stated in Jacksonville, "It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce." 317 U.S. at 567, 63 S.Ct. at 335. Thus, the Act will reach any substantial movement of goods whether they be empty or full. In this case, the return route of the empties is clearly an integral part of the appellants' business, for, under the distributor's agreement with Nehi, an equivalent number of empty bottles must be returned before full ones may be obtained. If the empties were not picked up, new ones would have to be purchased by the appellants on the open market. In addition, the handling of these empties is a substantial part of the employees' duties here in question. See 317 U.S. at 572, 63 S.Ct. at 337. Provided the other requirements necessary for the establishment of goods moving in commerce are shown, we are of the opinion that the movement of empty bottles may create a sufficient channel of interstate commerce for the application of the Fair Labor Standards Act.
 
 
 10
 In their reply brief, the appellants further argue that the interstate journey cannot begin until the goods are loaded on the interstate carrier, such that the drivers' helpers on the distributing trucks would not handle the bottles while they were "in commerce." This position was apparently well argued before the Court in the Stewart-Jordan case and is clearly stated in Judge Hutcheson's dissent. Whatever may be the merits of that argument, we are of the opinion that the majority opinion in that case is decisive for this Circuit and we will not reconsider it, except insofar as we discuss the particular facts in this case, infra. Other cases relied upon by the appellants to support a reversal of Stewart-Jordan were either distinguished by the majority in that case or do not deal with the return movement of empty containers.
 
 
 11
 The more substantial question is whether the facts in Stewart-Jordan may be distinguished from the case at bar. Stewart-Jordan relied on the Jacksonville case for two points. First, the Court in Jacksonville was concerned with the effect of warehousing goods for a short interval in the midst of an interstate journey. As the Court said, "if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain `in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended." 317 U.S. at 568, 63 S.Ct. at 335. In this case, where we are concerned with the return trip of the empties, the question is the effect of warehousing the empties before their return to Georgia. Assuming for the moment that there is a fixed agreement for the exchange of empties for full bottles at Columbus, Georgia, which fixes the destination of the empties from the time they are picked up at the retailers, then the warehousing is only a short temporary pause. Using the figures found in the record there are one or two complete turnovers of the empties inventory in the warehouse each week.
 
 
 12
 The crucial point is the nature of the agreement for the exchange of empties at the Georgia plant. Jacksonville treats the nature of the agreements which will maintain the interstate character of a shipment of goods over a temporary warehousing stop. The direction of the movement is reversed in this case, and the claimed intrastate leg of the trip is at the beginning instead of the end of the journey, but the principle is the same in both situations — between what two points is there a practical continuity of movement of certain designated goods. The Court pointed out in Jacksonville that no set rules can be laid down, but it did set the guidelines. Citing earlier cases, it commented:
 
 
 13
 "It was said in Swift & Co. v. United States, 196 U.S. 375, 398 [25 S.Ct. 276, 280, 49 L.Ed. 518], that `commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business.' While that observation was made apropos of the constitutional scope of the commerce power, it is equally apt as a starting point for inquiry whether a particular business is `in commerce' within the meaning of this Act." 317 U.S. at 570, 63 S.Ct. at 336.
 
 
 14
 Looking to the course of business of the party in that case, the Court found that the interstate character of the movement might be maintained: (1) where the goods move in accordance with a preexisting order from a customer; and (2) where "the contract or understanding pursuant to which goods are ordered, like a special order, indicates where it was intended that the interstate journey ends" — or in this case, begins. With this background, it becomes clear that we cannot just look to the wording of abstract agreements, but must consider them in the light of the party's course of business. This Court in Stewart-Jordan characterized the agreement and course of business there in question as follows:
 
 
 15
 "The record reveals that at the time appellant purchases the beer from the out-state breweries it has a set agreement with them that they will buy back at a stipulated price all the empty cases and bottles which appellant cares to return to them. And pursuant to their agreement and understanding appellant gathers the empty cases and bottles `for the purpose of sending them back.' Thus from the moment they are picked up by appellant's drivers and helpers their intended destination is beyond the warehouse to a specific out-state brewery." 210 F.2d at 431.
 
 
 16
 The appellants here argue that their agreement with Nehi is in no way similar to the one in Stewart-Jordan. They point out that there never was an agreement providing that Nehi purchase the empties; that the distributor's agreement put no obligation upon the appellants to buy their beverages from the Columbus, Georgia, plant; that the agreement and franchise were both terminable at will. They argue that, under such an arrangement,
 
 
 17
 "it was impossible to ascertain which, if any, bottles would ultimately be transported in interstate commerce. Equally as important, it was impossible to determine what quantity of the bottles being picked up would be sent to Columbus since any truckload of bottles reaching the warehouse might ultimately be transferred in its entirety to the Alabama supplier. Thus, it was possible to determine what bottles were intended for interstate commerce only after they had been removed from the warehouse and placed on a vehicle which was enroute to Columbus."
 
 
 18
 While certain provisions of the various agreements in the abstract and out of context might support this position, the argument falls when considered in the light of the appellants' normal course of business. First, the agreements themselves indicate that they are intended to establish a fixed and substantial pattern of business. The original 1952 franchise agreement between Nehi and the appellants (which provided for both bottling and distribution) required that the appellants devote their "entire time and best efforts" to the bottling and marketing of Nehi's products and prohibited them from dealing in the beverages of any other company. While such agreements are technically "terminable at will," they are fully relied upon by both parties until a notice of termination is given.
 
 
 19
 In 1957 the appellants desired to discontinue their bottling business and continue only with the distribution. Thus, in July of 1957 they amended the original franchise with a Distributor's Agreement. The second "whereas" clause provides as follows:
 
 
 20
 "WHEREAS, THE DISTRIBUTOR desires to purchase such beverages as produced by THE COMPANY at its new Bottling Plant in Columbus, Georgia, and to distribute them throughout the Territory described in said Franchises — thus being relieved from the duty of production as provided in said Franchises."
 
 
 21
 Section 3(a) of the agreement then provides that
 
 
 22
 "THE DISTRIBUTOR shall at the time of purchase of beverages deliver to THE COMPANY sound bottles and sound cases in number equal to those received by such purchase from THE COMPANY."
 
 
 23
 Thus, we find that under the various agreements themselves it was intended that the appellants use the Columbus, Georgia, plant and that empties would return to the Georgia plant in proportion to the amount of business that the appellants were doing. The so-called "terminable at will" provisions were not intended to make uncertain the day-to-day operation of the business, but only come into effect when one or both of the parties wish to make a substantial change in their normal mode of carrying on their respective businesses. When these provisions and stated intentions are then backed up with a normal course of business whereby over 95 per cent of the appellants' business is carried on in precise conformity with these provisions and stated intentions, we are confronted with a state of facts as strong as, if not stronger than, the situation in Stewart-Jordan. We can find with assurance that the empties were picked up from the retail outlets "for the purpose of sending them back" to the Columbus, Georgia, bottling plant. Therefore, we are of the opinion that the lower court was correct when it found that the warehouseman and the driver-helpers on the distributing trucks were covered by the Fair Labor Standards Act, in accordance with our holding in the Stewart-Jordan case.
 
 
 24
 The appellants argue that, if the employees in question are covered by the Act, they are nevertheless exempt from the overtime provisions under section 13(b) (1) of the Act, 29 U.S.C.A. § 213(b) (1) which exempts all those employees whose maximum hours of service are subject to regulation by the Interstate Commerce Commission. The question under the section is not whether the employees are regulated, but whether the ICC has the power to regulate them; and in United States v. American Trucking Ass'ns, 1940, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345, the Court held that the power of the ICC is "limited to those employees whose activities affect the safety of operation" of vehicles in interstate or foreign commerce. With respect to the warehouseman, McGinty testified that his primary job was handling the empty and full bottles within the warehouse; that it was not part of his job to load the supply truck, although on infrequent occasions he did help out; and that he did not load the distributing trucks. Since it was no part of his job to assist in the actual loading of any interstate vehicle, it is difficult to see how his activity could in any way affect the safety of these vehicles. What infrequent help he did give to the driver of the supply truck comes within the de minimis rule set down by the Supreme Court in Pyramid Motor Freight Corp. v. Ispass, 1946, 330 U.S. 695, 708, 67 S.Ct. 954, 960, 91 L.Ed. 1184, where it said:
 
 
 25
 "In contrast to the loading activities in the Levinson case [Levinson v. Spector Motor Service, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158], the mere handling of freight at a terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may form so trivial, casual or occasional a part of an employee's activities, or his activities may relate only to such articles or to such limited handling of them, that his activities will not come within the kind of `loading' which is described by the Commission and which, in its opinion, affects safety of operation."
 
 
 26
 The driver-helpers, however, pose a different problem; they are on the trucks at all times, and they perform a number of recurring functions which relate to the safety of the vehicle, such as, loading and unloading cases of bottles and helping to direct the distribution trucks back onto crowded highways. Following the American Trucking Ass'ns case, the ICC made an exhaustive report on the types of jobs which it felt affected the safety of operation of vehicles under its jurisdiction. Ex parte MC-2, 28 M.C.C. 125 (1941). This report was the primary authority upon which the Supreme Court relied in two later cases concerning the scope of section 13(b) (1). Levinson v. Spector Motor Service, 1947, 330 U.S. 649, 67 S. Ct. 931; Pyramid Motor Freight Corp. v. Ispass, supra. One of the job classifications over which the ICC determined it had authority was "helpers" — employees other than the driver who rode on vehicles under ICC jurisdiction. The primary employees whom the Commission had in mind were those who accompanied the driver on over-the-road trips and helped to relieve the driver, to place flares, to change tires, etc. The Commission went on, however, to consider other types of employees who ride on vehicles, such as guards on armored bank trucks and stewardesses on certain bus lines. It concluded that even these employees performed services which affect the safety of the vehicle upon certain occasions. The Commission said:
 
 
 27
 "We believe that it is neither necessary nor practicable to draw fine distinctions between the work done by the various employees who ride on the motor vehicle in other capacities than that of driver. To some extent at least they all engage in activities which directly affect safety of operation." 28 M.C.C. at 136.
 
 The Commission then concluded:
 
 28
 "We further find that the term `helpers' as used herein includes all employees, other than the drivers, who are required to ride on a motor vehicle when it is being operated in interstate or foreign commerce." Id. at 139.
 
 
 29
 We feel that this finding by the Commission is determinative, and we therefore conclude that the driver-helpers in this case are exempt from the overtime provisions of the Fair Labor Standards Act by section 13(b) (1) of that Act.
 
 
 30
 The Secretary of Labor cross-appeals the denial of an injunction. This issue has been before us a number of times and the rule we have followed for reviewing the discretionary denial of an injunction is set down in Mitchell v. Hodges Contracting Co., 5 Cir., 1956, 238 F.2d 380, 381. The court below denied the injunction on the grounds that there was a substantial legal question of coverage, that up to the time of trial violations were inadvertent and unintentional, that McGinty had an abiding respect for the law and was not likely to violate the Act in the future. With deference, we do not believe that the evidence will support these findings and the subsequent denial of the injunction. On appeal, the appellants added that they relied on the advice of legal counsel, one Mr. Battle, attorney for the Nehi Corporation. While there may have been good faith reliance on legal advice prior to the first notice of probable coverage given by the Wage and Hour authorities in November of 1959, it will not hold up after that time. The cross-examination of Mr. Yetta G. Samford, Jr., appellants' attorney, indicates that the appellants realized the probability of coverage after a meeting with the Wage and Hour authorities in December of 1959. We are further of the opinion that, after our decision in Stewart-Jordan, there was no longer a substantial legal question of coverage. See Mitchell v. Jax Beer Distributors of Beaumont, Inc., 5 Cir., 1961, 290 F.2d 24.
 
 
 31
 The evidence shows that appellants were unwilling to comply until the imminence of legal compulsion made it inevitable. While the appellants revised the hours of the warehouseman to comply in January of 1960, the revised schedule did not go into effect until May according to the testimony of the warehouseman. With respect to the driver-helpers, they never complied at all until one week before trial in October 1960, when they obviated the necessity of raising their wages by switching to an intrastate supplier in Eufaula, Alabama. In both cases, the appellants could have come into immediate compliance in January of 1960 by simply raising the wages of their employees.[3]
 
 
 32
 Moreover, in light of their concurrent position on other points that there was no set agreement to use the Columbus plant and that they could change to intrastate suppliers at any time, the failure to change until one week before trial itself indicates their unwillingness to comply until the last possible moment. This evidence, rather than showing that continued violations were inadvertent and unintentional, demonstrates the appellants' unwillingness to comply with settled interpretations of the Act. One further element which we feel justifies the issuance of an injunction is the flexibility in the appellants' operations. They can shift back and forth between intrastate and interstate suppliers on very short notice with no change in business operations other than different route directions to their supply truck. Combine the appellants' attitude with respect to compliance and the ease with which they can switch back to the more convenient Columbus plant, and we are of the opinion that an injunction may be the only alternative to constant policing of the appellants' business to insure continued compliance with the law. We hold, therefore, that the district court erred in refusing to issue an injunction.
 
 
 33
 The judgment is reversed with directions to enter a decree in accordance with the foregoing opinion.
 
 
 34
 Reversed with directions.
 
 
 
 Notes:
 
 
 [1]
 29 U.S.C.A. § 201 et seq., 52 Stat. 1060, 63 Stat. 910
 
 
 [2]
 29 U.S.C.A. § 213(b) (1)
 
 
 [3]
 Their attitude on this point is clearly reflected in the following testimony by Mr. Yetta G. Samford, Jr., on cross-examination:
 "Q. Well * * * at all times when you spoke of compliance, you meant to arrange the operations of the business so that they would — these employees would no longer be covered; is that not correct?
 "A. Either that the operation would not be covered or that there would be no employees who would be underpaid; yes, sir.
 "Q. Well, it never was considered that the — that the employees would be raised in pay to a dollar an hour, was it?
 "A. No, sir; it was considered it would be impossible to pay the helpers a dollar an hour * * *."
 
 
 
 35
 CARSWELL, District Judge (concurring in part and dissenting in part).
 
 
 36
 I agree that the Stewart-Jordan case is dispositive with reference to the warehouseman here and for the reasons ably and carefully drawn in the majority opinion. Thus, I concur in the conclusion that the warehouseman is covered by the Fair Labor Standards Act. Although I agree with Judge Hutcheson's dissent in Stewart-Jordan, and for the reasons given by him there, the treatment of the issues by the majority opinion in that case was applicable in the instant case and was, therefore, correctly construed by the District Court as controlling.
 
 
 37
 I am also in full agreement with the Court's opinion here that the driver-helpers are exempt from the overtime provisions of the Act by virtue of their subjection to the regulations of the Interstate Commerce Commission, and that they are covered by the Fair Labor Standards Act as to minimum wages.
 
 
 38
 With great deference, however, I must dissent from the reversal of the District Court on the issuance of injunction. Reading the majority opinion itself readily discloses that the District Court could scarcely have been in great error in its view that there was a substantial question of law on the issues ultimately determined against Opelika. Indeed, it is the unanimous view of this Court that Opelika, now to be enjoined, was correct in its insistence that its driver-helpers were exempt from the overtime provisions of the Fair Labor Standards Act, and thus, the violations found by this Court are in some measure less extensive than those found by the District Court itself.
 
 
 39
 On more fundamental grounds, though, I cannot agree that injunction should issue. Despite the finding of the District Court that Opelika was in violation of the Act, that Court on the record before it also concluded that there was no necessity for the issuance of an injunction in order to insure future compliance with the Act. This conclusion was plainly a judicial function within the discretionary powers of that Court and should not be overturned unless there was a clear showing of abuse of such discretion. It is my view that the injunctive power of Courts should never be invoked lightly, nor should it be converted into a mere ministerial function triggered automatically upon the finding of an infraction of the law. This seems particularly so in an area such as this where rather fine distinctions in regulations and statutes must be made, and in the absence of more persuasive evidence of deliberate intentional violation of the Act. See Mitchell v. C. P. Shoe Corp., 5 Cir., 286 F.2d 109. This is a matter historically directed to the sound discretion of the District Court for the primary purpose of insuring future compliance with the law and not so much punishment for past wrongs.
 
 
 40
 I see nothing in the record here or in the majority opinion compelling reversal on this issue. Applying long-established standards of review, the violations being technical in nature and without aggravating factors impelling the thrust of injunction to give full assurance that the Congressional purposes expressed by the Fair Labor Standards Act would be respected, I find no abuse of discretion and would not compel the issuance of injunction.