Paul C. HARSHMAN, Plaintiff,

v.

WELL SERVICE, INC., Defendant.

Glenn R. JACOBS, Plaintiff,

v.

WELL SERVICE, INC., Defendant.

Beryl D. WARD, Plaintiff,

v.

WELL SERVICE, INC., Defendant.

Civ. A. Nos. 64–380, 64–381, 64–465.

United States District Court
W. D. Pennsylvania.

Dec. 30, 1964.

Charles R. Volk, of Thorp, Reed & Armstrong, Pittsburgh, Pa., and James Hook, of Hook & Hook, Waynesburg, Pa., for plaintiffs.

Fred C. Houston, Jr., of Houston & Houston, Pittsburgh, Pa., and Paul N. Bowles, Charleston, W. Va., for defendant.

MARSH, District Judge.

These consolidated actions are for the recovery of unpaid overtime compensation which the plaintiffs allege is due them under the provisions of § 7 of the Fair Labor Standards Act, 29 U.S.C. § 207. Section 13(b) (1) of the Fair Labor Standards Act, 29 U.S.C. § 213(b) (1), provides an exemption from the maximum hours and overtime requirements of § 7 as regards "any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49". It appears that the plaintiffs, during the respective periods covered by their claims, were indeed subject to the Commission's regulatory power, and thus barred from recovery herein, if (1) the defendant was at such pertinent times a "private carrier of property by motor vehicle" within the meaning of 49 U.S.C. §§ 304 (a) (3) [1] and 303(a) (17),[2] and (2) the

duties performed by each and every one of the plaintiffs, during such periods, substantially affected the safety of operation of defendant's motor vehicles in the transportation of its property on the public highways in interstate commerce in furtherance of its commercial enterprise.

After trial to the court without a jury, I find in favor of the defendant, and consistent with such determination, make the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The defendant, Well Service, Inc., is a corporation organized and existing under the laws of the State of West Virginia, and is and at all pertinent times was engaged in the business of servicing and repairing oil and gas wells. Its principal place of business is at Charleston, West Virginia. It does business in Pennsylvania and has an office located at R.D. #6, Washington, Washington County, Pennsylvania. Its customers are located in West Virginia, Pennsylvania, Ohio, Kentucky, Virginia, and other states.

2. The plaintiff, Paul C. Harshman, was employed by the defendant from September, 1956 (T., p. 122) through December, 1962. His claim for overtime compensation covers the period from April 21, 1962 through December, 1962.[3]

1. "§ 304. Powers and duties of Commission—Powers and duties generally

"(a) It shall be the duty of the Commission—

"* * *

"(3) To establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment. * * *"

2. "§ 303. Definitions and exceptions—Definitions

"(a) As used in this chapter—

"* * *

"(17) The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract car-

rier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle *property of which such person is the owner*, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or *in furtherance of any commercial enterprise.*" (Emphasis ours.)

3. Section 255, 29 U.S.C., provides that any cause of action claimed to arise under 29 U.S.C. § 207 "shall be forever barred unless commenced within two years after the cause of action accrued". Plaintiffs Harshman and Jacobs filed their complaints commencing these actions on April 21, 1964, and plaintiff Ward on May 12, 1964. In the pretrial stipulations, plaintiffs Harshman and Jacobs have stipulated with the defendant that, as to them, said statute of limitations has run on all work periods prior to April 21,

At all times pertinent, he lived in the vicinity of Washington, Pennsylvania, and reported to and worked out of defendant's base of operations there.

3. The plaintiff, Glen R. Jacobs, was employed by the defendant from April 1, 1961 through November, 1963. His claim for overtime compensation spans the period from April 21, 1962 through November, 1963. Until November 1, 1962, he lived in Cameron, West Virginia, and in tandem with plaintiff Ward worked out of what may be loosely (see finding No. 6, infra) described as the Cameron "base of operations". Thereafter, and through November, 1963, he lived in Washington, Pennsylvania, and reported to and worked out of defendant's base of operations there.

4. The plaintiff, Beryl D. Ward, was employed by the defendant from September, 1959 (T., p. 7) through February, 1964. His claim for overtime compensation covers the period from May 12, 1962 through February, 1964. At all times pertinent, he lived in and worked out of Cameron, West Virginia, except that he generally reported for work at the Washington base of operations during the defendant's winter seasons of 1962–1963 and 1963–1964.

5. The Washington, Pennsylvania, base of operations consisted of a branch office, shop, garage, and yard. Three of defendant's specially constructed pump trucks and three of its pickup trucks were garaged there. Various pieces of equipment and replacement parts were stored there. All of the plaintiffs reported there for work during the defendant's winter seasons.

6. The Cameron, West Virginia, "base of operations" appears to have been only a working arrangement whereby Ward and, for a time, Jacobs, were permitted to keep one of the defendant's pump trucks in a rented garage in Cameron, and drive same directly to the various job sites, thus foregoing any hardship entailed in reporting to work in Washington, as well as cutting down on mileage and road expenses. Both Cameron and Washington are near the West Virginia-Pennsylvania border, Cameron lying in the "panhandle" region of West Virginia which wedges tightly between southwestern Pennsylvania and southeastern Ohio in that general tri-state area.

7. From April, 1962 through February, 1964, the Washington and Cameron bases of operation serviced customers in West Virginia, Ohio and Pennsylvania. The chief customer activity consisted of "cementing" gas wells. This operation involved pressure-pumping a cement slurry down a pipe or casing installed in a well, causing the slurry to rise up along the outside of the pipe or casing to form a solid cement covering thereon and between said pipe or casing and the earth surrounding the drilled hole in which the pipe or casing had been set. Indispensable to this cementing operation was the heavy pumping equipment owned by defendant and permanently mounted upon each of its four specially constructed well-servicing vehicles (generally referred to herein as "pump trucks"). Also necessary to the operation were a tub, hopper, mixer, discharge pipes, suction hose and a few other pieces of auxiliary portable equipment, weighing in all 1,000 to 2,000 pounds, which items were owned by defendant and transported on its pump trucks to all job sites.

8. To fill an order from a well owner for a cementing job, defendant would dispatch one (and sometimes, two) of its pump trucks to the job site, together with a pickup truck carrying approximately 400 pounds of other portable tools and equipment owned by defendant and used in the operation. Normally, three employees were assigned to a job. One employee drove a pump truck to the job site from either Washington or Cameron; another, the job supervisor (called "the cementer") drove the pickup truck; and the third employee, when there was

1962, and plaintiff Ward has stipulated with defendant that the statute of lim-

itations has run as to him on all work periods prior to May 12, 1962.

one, would ride to the job site in one of the aforesaid trucks or by private car, or else drive a second pump truck to the site.

9. At the job site, the two employees other than "the cementer" would unload the portable auxiliary equipment from the pump truck(s),[4] assemble it, and connect it to the permanently mounted pumping equipment.[5] After taking whatever measures were necessary to "kill" the gas well to ensure that the job would proceed safely, and mixing the cement,[6] they would commence pressure-pumping the cement into the pipe set in the drill hole.

10. The actual cementing operation, together with all time spent in unloading, assembling, disassembling and reloading the portable equipment owned by defendant, required one to two hours for rotary-drilled wells and a little longer for cable-drilled wells. Usually, however, because of drilling and construction delays arising in the activities of the well owner or drilling contractor, defendant's trucks and men would arrive at the job site only to find that the well was not ready for cementing. Then, the defendant's men stood idly by (and were paid) for hours on end (to an extreme of 33 consecutive hours spent on one job) until given a "go-ahead". Upon completion of the cementing job or jobs required at any particular well site, the defendant's men and equipment would return to Washington and Cameron or, on occasion, perform another job at a different site before returning.

11. Each of the plaintiffs, during the period covered by his claim for overtime compensation, was employed by the defendant to drive its pump trucks and the permanently mounted and portable property thereon to job sites; to load, unload, and reload portable cement job equipment; to operate the pumps and conduct the actual cementing operations; and to perform routine maintenance work on the pump trucks and generally keep them in safe operating condition.

12. Every pump truck owned by defendant and assigned to its Washington and Cameron bases of operation was used to transport defendant's pumping equipment and auxiliary portable equipment on public highways in interstate commerce in furtherance of defendant's commercial enterprise. In fact, those vehicles, operated interchangeably by each of the plaintiffs,[7] frequently did move in interstate commerce in such manner during the time periods in question.

13. During the time periods in question, each of the plaintiffs, as part of his bona fide duties, reasonably expected to be called upon at any time and was in fact called upon frequently in the ordinary course of his work to perform regularly and from time to time the duties of a truck driver, driver's helper, loader and mechanic with regard to defendant's pump trucks.

14. The safety-affecting maintenance work done (whenever needed) on the pump trucks by plaintiffs included repair, replacement and adjustment of lights, brake repairs and adjustments,

---

4. They would also, on occasion, assist in loading and unloading the portable equipment carried on the pickup truck.

5. This permanently mounted pumping equipment consisted of a mixing pump (used to mix the cement), a motor used to operate the mixing pump, and the pressure pump (used to pump the cement slurry through the discharge pipes and into the well), which was the larger of the two pumps. Some of the pump trucks also carried an auxiliary motor or motors on the rear, used to operate the pressure pump. Otherwise the pressure pump was operated from the truck motor itself. Of course, there were various valves, gauges and tubing attached to the pumps and motors.

6. Generally, the cement, cement additives, water, and any other mixing materials were furnished by the well owner or by the drilling contractor.

7. Plaintiff Ward did not always have the same pump truck at Cameron. It appears that the defendant's pump trucks were at various times transferred between Cameron and Washington, three being kept at Washington at all times.

horn repairs and adjustment, windshield wiper replacements and adjustments, oiling and greasing, replacement of defective accessory parts, tire and wheel changings, and other related minor [8] repairs, maintenance and adjustments.

15. Any time one of the plaintiffs rode as a passenger on one of the pump trucks, whether across state lines or not, he was expected to act as driver or perform other duties affecting the safety of operation of said vehicles, if the need arose. In fact, such driver's helpers did from time to time take over the driving and perform other safety-affecting duties.

16. Since the plaintiffs at all pertinent times were the only full-time pump truck operators based at Cameron and Washington, to the extent that those pump trucks and the property thereon moved or could reasonably be expected to move in interstate commerce, plaintiffs were the only employees of defendant who were responsible for such movement.

17. Since the job sites serviced by defendant from its Washington and Cameron bases were in West Virginia, Ohio and Pennsylvania, the plaintiffs accordingly drove defendant's property to and worked at job sites in each of those states during the time periods in question and could reasonably have expected to be called upon at any time to drive to such sites. The plaintiffs were used interchangeably for this purpose, although plaintiff Ward did less out-of-state traveling than the other two plaintiffs.

18. Since most of the defendant's cementing operations were performed at well sites in West Virginia during the pertinent time periods, and three of defendant's four pump trucks were garaged at Washington, the transportation of these vehicles and the property thereon from Pennsylvania to Ohio and West Virginia necessarily entailed movement in interstate commerce.

19. Even though plaintiff Ward worked out of Cameron during the entire period covered by his claim, and plaintiff Jacobs worked out of Cameron during the first 6 of the approximately 19 months covered by his claim, each of them drove defendant's pump trucks and property thereon in interstate commerce to Ohio or Pennsylvania on an average of at least one trip per month from Cameron. Moreover, they performed work as driver's helpers, loaders and mechanics on all of the pump trucks garaged at Washington and Cameron. As heretofore indicated, plaintiff Ward reported to work at Washington during the winter seasons, and while there, together with the other plaintiffs, spent a considerable portion of his time in maintenance work on the pump trucks and pumping equipment. And even during the winter seasons, plaintiffs were occasionally sent out to job sites and drove defendant's pump trucks and property across state lines.

20. During the period from January 1, 1962 [9] until the termination of each plaintiff's employment with defendant, Harshman made 166 total trips, 157 of which were out-of-state (Harshman only worked through December, 1962); Ward made 394 total trips, 62 of which were out-of-state; and Jacobs made 334 total trips, 200 of which were out-of-state.

21. During the relevant time periods, each plaintiff, interchangeably, reasonably expected to be called upon to do work substantially and directly affecting the safety of operation of defendant's pump trucks while said vehicles were

---

8. Any major mechanical work was generally done by independent mechanics, inasmuch as the defendant did not employ anyone at Washington or Cameron who specialized in repairing and maintaining trucks.

9. Defendant's Ex. G. Defendant has not provided the court with a trip breakdown coinciding exactly with the time periods covered by the plaintiffs' claims, but I will take judicial notice that the period from January 1, 1962 until April 21, 1962 and May 12, 1962 covered part of a winter season and, therefore, the respective number of trips made by the plaintiffs during the relevant time periods cannot be significantly less than the totals furnished.

transporting defendant's property in interstate commerce in furtherance of its commercial enterprise. In fact, they routinely did such safety-affecting work.

22. A prime purpose (if not *the* prime purpose) for the operation of defendant's pump trucks in interstate commerce was the transportation of defendant's cement-pumping equipment (property) to job sites in states other than that of the point of origin. Defendant's property, in the form of permanently mounted pumping equipment as well as portable auxiliary equipment, was absolutely indispensable to performance of the service provided by defendant.

## DISCUSSION

■ *Transportation of "Property".* I entertain no doubt but that defendant was a private carrier of *property* by motor vehicle within the meaning of 49 U. S.C. §§ 304(a) (3) and 303(a) (17). Unquestionably, the transportation of the pumping equipment permanently mounted on defendant's trucks was indispensable to the performance of the service provided by defendant. It is fair to say that whenever those pump trucks moved in interstate commerce, as they often did, the prime purpose, or a prime purpose, of such movement was to transport the pumping equipment and the auxiliary portable equipment to and from a job site. Plaintiffs contend that there was no such "property" transported by the trucks, since, by their view, the pumping equipment has to be viewed as "unitized" in the truck itself. This view I regard as highly unrealistic. The pumping equipment had nothing to do with the mechanical function of the trucks. Had it not been permanently affixed to the truck chassis, it is scarcely imaginable that plaintiffs would contest its classification in the category of "property" for transportation. It was permanently affixed, however, thereby enhancing the comparative safety with which it could be transported on the public highways. It would be ironic in the extreme if I were to interpret this laudable safety measure as removing the defendant from the ambit of the Interstate Commerce Commission's power to regulate the safety of operations of carriers in interstate commerce. The pumping equipment and auxiliary portable equipment carried on the pump trucks did constitute "property", was owned by the defendant, and was transported in interstate commerce in furtherance of defendant's commercial enterprise.

■ *Duties Substantially Affecting the Safety of Operation of Motor Vehicles.* The test to be applied here is whether each plaintiff, during the relevant time periods, performed duties which substantially affected the safety of operation of defendant's pump trucks in interstate commerce. Levinson v. Spector Motor Service, 330 U.S. 649, 685–694, 67 S.Ct. 931, 91 L.Ed. 1158 (dissenting opinion of Mr. Justice Rutledge); Yellow Transit Freight Lines, Inc. v. Balven, 320 F.2d 495 (8th Cir. 1963). In this respect, neither the name given to their positions nor that given to the work that they did is controlling. Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184. From Levinson v. Spector Motor Service, supra 330 U.S. at pp. 674–675, 67 S.Ct. at p. 944 we know that, from the point of view of the Interstate Commerce Commission and its jurisdiction over safety of operation, "[i]t is the character of the [safety-affecting] activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment." And the Administrator of the Wage and Hour Division has promulgated the following interpretation in 29 C.F.R. § 782.2(b) (2), at page 622:

"(2) As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is (or, in the case of a member of a group of drivers, driver's helpers, loaders or mechanics employed by a common carrier and

engaged in safety-affecting occupations, that he is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities [relating to the safety of operation of motor vehicles on the public highways in transportation in interstate commerce] * * *, he comes within the exemption in all workweeks when he is employed at such job. * * * [T]he exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting 'safety of operation'." [10]

While the above interpretation of the Administrator specifically refers only to employees of common carriers, I am mindful that in analyzing the safety-affecting duties of the employees involved in Levinson v. Spector Motor Service, supra, the Supreme Court taught that the result does not turn upon differences among the classifications of common, contract and private carriers. Id. at pages 654–655, 67 S.Ct. 931. I am also mindful of the Supreme Court's admonition in Levinson (at p. 677, 67 S.Ct. 931) that the authority of the Wage and Hour Administrator is limited to those employees of motor carriers whose activities do not affect the safety of operation; that in reconciling the Fair Labor Standards Act and Motor Carrier Act, a court must think in terms of *safety first*. I must, in accord with Levinson's teaching, "give full effect to the safety program to which Congress has attached primary importance, even to the corresponding exclusion by Congress of certain employees from the benefits of the compulsory overtime pay provisions of the Fair Labor Standards Act." Id. at p. 662, 67 S.Ct. at p. 938.

■ Measured by the applicable standards, it seems clear that the totality of safety-affecting duties performed by each of the plaintiffs did substantially and directly affect the safety of operation of defendant's pump trucks in the transportation of property in interstate commerce. That the actual proportion of time spent in such activities may have been considerably less than that spent at a job site [11] (including the stretches of stand-by time) is an irrelevant consideration, as is the relative proportions of trips actually made out of state, so long as each plaintiff's duties substantially affected the safety of operation of the pump trucks in interstate commerce, and the involvement of those trucks in interstate commerce was not de minimis. Plaintiff Ward, it is true, travelled across state lines somewhat less often proportionately than Harshman and Jacobs. But the defendant's job assignments relating to activities affecting safety of operation were indiscriminately distributed among the three plaintiffs, each of whom could reasonably be expected at any time to perform such activities, and each plaintiff's activities were a natural, integral and apparently inseparable part of the service performed by the defendant and the plaintiffs. Morris v. McComb, 332 U.S. 422, 433, 68 S.Ct. 131, 92 L.Ed. 44. Besides, it would appear that the activities performed by Ward, wholly aside from their correlation with the duties of Harshman and Jacobs, did in themselves substantially and directly affect the safety of operation of the pump trucks in interstate commerce. I am not dissuaded from this view by the plaintiffs' exhortation to resolve any doubts in favor of the humanitarian purposes of the Fair Labor Standards Act. As the Supreme Court indicated in the Levinson case, Congress apparently thought it even more humanitarian to give the Interstate Commerce

---

10. See: Kerr v. Jeans, 193 F.2d 572 (5th Cir. 1952).

11. See generally: Richardson v. James Gibbons Co., 132 F.2d 627 (4th Cir. 1942), aff'd sub nom. Southland Gas-oline Co. v. Bayley, 319 U.S. 44, 63 S.Ct. 917, 87 L.Ed. 1244 (cited favorably, Levinson v. Spector Motor Service, supra, 330 U.S. at p. 676, 67 S.Ct. 931); Corbett v. Schlumberger Well Surveying Corp., 43 F.Supp. 605, 609 (S.D.Tex.1942).

Commission extensive power to avoid slaughter on the highways.[12]

I hold that § 13(b) (1) of the Fair Labor Standards Act, 29 U.S.C. § 213(b) (1), bars all of the plaintiffs from any recovery in these civil actions.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter and of the parties to this action, pursuant to 28 U.S.C. § 1337 and § 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b).

2. During the time period covered by each plaintiff's claim for unpaid overtime compensation, defendant was engaged in interstate commerce or in the production of goods for commerce, and so were the plaintiffs, within the meaning of § 7 of the Fair Labor Standards Act, 29 U.S.C. § 207.

3. At all pertinent times, the defendant was a private carrier of property by motor vehicle within the meaning of 49 U.S.C. §§ 304(a) (3) and 303(a) (17),

and, accordingly, the Interstate Commerce Commission had the power to establish for it "reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment."

4. The plaintiffs and each of them, at all pertinent times, performed duties which substantially and directly affected the safety of operation of defendant's pump trucks in the transportation of defendant's property in interstate commerce in furtherance of its commercial enterprise, and, therefore, by virtue of § 13(b) (1) of the Fair Labor Standards Act, 29 U.S.C. § 213(b) (1), none of the plaintiffs has any claim for overtime compensation and none of them is entitled to recover any amount in this action.

5. Judgment in each of the above-captioned actions will be entered in favor of the defendant, dismissing such action upon the merits.

---

12. There is some evidence that the Commission is actually exercising its jurisdictional power in regard to employees working under somewhat similar conditions. Thus, 49 C.F.R. § 190.33 provides:

"Parts 190–197 of this subchapter shall be applicable to common carriers, contract carriers, and private carriers subject to Part II, Interstate Commerce Act (49 U.S.C. 301 et seq.) * * *."

In addition, 49 C.F.R. §§ 195.2(a) (9), 195.3(a), and 195.3(d) provide respectively:

"(9) In the case of specially trained drivers of specially constructed oil well servicing vehicles, on duty time shall not include waiting time at a natural gas or oil well site, provided that all such time shall be fully and accurately accounted for in records to be maintained by the motor carrier. Such records shall be made available upon request of this Commission."

"(a) Except as provided in paragraphs (c) and (e) of this section and in § 195.10, no motor carrier shall permit

or require any driver used by it to drive nor shall any such driver drive more than 10 hours following 8 consecutive hours off-duty or drive for any period after having been on duty 15 hours following 8 consecutive hours off-duty; Provided, however, That drivers using sleeper berth equipment, *or off-duty at a natural gas or oil well location*, may cumulate the aforementioned total of at least eight hours off-duty in two periods of at least two hours each, resting in a sleeper berth, as defined in § 195.2(g), or resting while off-duty in other sleeping accommodations at a natural gas or oil well location." (Emphasis ours.)

"(d) In the instance of drivers of motor vehicles used exclusively in the transportation of oilfield equipment, including the stringing and picking up of pipe used in pipelines, *and servicing of the field operations of the natural gas and oil industry*, any period of 8 consecutive days may end with the beginning of any off-duty period of 24 or more successive hours." (Emphasis ours.)