Joe N. SINCLAIR, Larry C. Armour and Charles E. Holtzclaw

v.

BEACON GASOLINE COMPANY.

Civ. A. No. 18910.

United States District Court,
W. D. Louisiana,
Shreveport Division.

June 14, 1976.

---

**6**

Hugh T. Ward, Peters, Ward & Miller, Shreveport, La., for plaintiffs.

Harry Campbell Jr., Smith, Smith, Dunlap & Canterbury, Ronald T. Howard, Dallas, Tex., Henry A. Politz, Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, La., for defendant.

## OPINION

STAGG, District Judge.

Plaintiffs Joe N. Sinclair, Larry C. Armour and Charles E. Holtzclaw brought this action against defendant Beacon Gasoline Company, seeking overtime compensation, liquidated damages, penalties and attorney's fees under the Fair Labor Standards Act (FLSA), 29 U.S.C.A. § 201, *et seq.* Plaintiffs are all employees or former employees of defendant. The crux of Beacon's defense lies in the exemption provisions of the Act. It claims it is entitled to exemption as a private motor carrier via § 213(b)(1), and that, if it is not so entitled, it is exempt from payment to plaintiff Holtzclaw because of his capacity as a bona fide executive employee under § 213(a)(1).

## FINDINGS OF FACT

Beacon Gasoline Company (Beacon) operates a natural gas processing plant in Webster Parish, Louisiana, processing natural gas purchased by other transmission companies. In addition, it maintains a pipeline and gas gathering system servicing 80 to 90 wells.

The pipeline system contains approximately 125 miles of pipeline, 25 miles of which is located in the State of Arkansas. One line runs from the plant, about 12 miles north of Minden, Louisiana, to Shongaloo, Louisiana, consisting of an eight-inch line 15 miles in length, along with a six-inch return line. Another six-inch line runs from Shongaloo to Springhill, Louisiana, extending about seven miles. A third six-inch line runs 17 miles from the Springhill compressor site to the processing plant. A ten-mile main line runs from Cotton Valley, Louisiana, to the processing plant, and an eight-mile line runs between Leton, Louisiana, and Haynesville, Louisiana. In addition, a ten-mile line, laid in early 1970, six inches at some parts and four at others,

runs from the Springhill compressor to a site in Arkansas.

The gas-gathering system is composed of smaller lines, called "lateral lines", from the main pipeline to the individual wells. It also includes compressors to increase gas pressure for transmission further down the line. At the time crucial to this litigation, Beacon maintained two compressors in Shongaloo, one in Cotton Valley and a small compressor at the Arkansas site. One of the Shongaloo compressors was later moved to Springhill.

The entire system of pipelines, gathering equipment and processing plant continues operation 24 hours per day, virtually all year around. Beacon employs persons to maintain and repair the system. Some employees maintain the plant equipment (plant men), while others maintain the extremities of the system (field men). With the exception of Holtzclaw, who allegedly became a supervisor, all the plaintiffs worked as field men during their employment with Beacon between April, 1970, and April, 1973, the pertinent period of the instant case.

At the time he filed his complaint, plaintiff Charles E. Holtzclaw no longer was employed by Beacon, but he had been so employed from September, 1959, to July, 1974, during the entire period of the controversy. For the period under study, he worked as a field man for the company. Defendant claims that at some point in time he became a supervisor, exempt from the FLSA by virtue of 29 U.S.C. § 213(a)(1) as a bona fide executive employee. Holtzclaw, however, testified that his duties never changed upon his "promotion". For reasons that will become evident later, it is unnecessary for the Court to reach that issue. Hence, the Court need only determine the nature and extent of his duties as a field man, accepting his own contention that his duties remained the same during the entire period in controversy.

As a field man, Holtzclaw had a variety of general duties. These included changing meter charts, maintaining compressors and helping to overhaul compressors. In addition, apparently during summer months when less maintenance was required, he cut grass, painted and did some insulation work. A major portion of his duties consisted of the maintenance and repair of main pipelines and lateral lines. These duties were comprised of fixing leaks and clearing "ice plugs" that formed in the lines, reducing or increasing pressure outside of normal parameters. He also performed general roustabout work. Occasionally he assisted in adding new pipeline to the system and making necessary tie-ins.

Holtzclaw did not have a particular assigned area, generally covering the entire area of the pipeline and gas gathering system in Louisiana and Arkansas over a period of time. To accommodate his work, Beacon furnished him with a half-ton pickup truck in which to transport himself and his tools and equipment to various job sites within the system. He regularly carried small tools, small parts and pipe fittings, and ink for meters in the truck. On occasion, he carried methanol to aid in maintenance of the pipeline and compressor system. He used the truck, so loaded, to check and repair wells in both Arkansas and Louisiana. He testified that he spent about 20 per cent of his time in Arkansas during the period in question, and he estimated that he drove into Arkansas during every week of the period. In Arkansas, he worked on ice plugs when necessary and occasionally walked the pipeline and checked it for leaks, all this activity continuing throughout the period covered by his allegations.

Plaintiff Larry C. Armour worked as a field hand for Beacon from March, 1970, through June or July, 1974. He testified that he did basically the same work as the other field men, which would include the maintenance of compressors and the maintenance of the pipeline and gas gathering system in both Louisiana and Arkansas. He also said that part of his job was to change meter charts regularly, every eight days. The meters were located in Louisiana and Arkansas.

Like Holtzclaw, Beacon furnished Armour with a half-ton pickup truck in which to

transport himself and his tools and equipment to job sites. Armour stated that he regularly carried tools and supplies for work, including methanol, meter charts and ink in the truck. He occasionally hauled some pipeline parts for use in the construction of the pipeline system in Arkansas. He spent about 50 to 75 per cent of his time behind the wheel, covering a distance of 2,000 to 4,000 miles per month in his truck during the time of the allegations. Both he and plaintiff Sinclair testified that the mileage and time spent driving was about the same for all field men.

According to his testimony, Armour used his tools and truck for work in Arkansas with frequency during the winter season. The winter season included a period of about five months per year when ice plugs were a major problem. It was during this period that all three claimants claimed long working days. Armour stated that in the winter season his travails took him to Arkansas every day, but that in the summer he seldom had occasion to go to Arkansas. The latter statement is certainly understandable, because the evidence conclusively showed that there were much fewer maintenance problems overall during the summer months.

Beacon employed plaintiff Joe N. Sinclair in November, 1969, and his employment continued throughout the time of the allegations of this lawsuit and through its trial on the merits. He served as a field man, hunting ice plugs and leaks with the same basic duties as those described for Holtzclaw and Armour. He generally covered the area of Cotton Valley, Haynesville and Dykesville, all in Louisiana. Sinclair used a company-furnished pickup truck for transportation to job sites. He testified that he spent 50 to 75 per cent of his time driving and that his mileage ran similarly to that of plaintiff Armour. He carried the same tools and equipment in the truck as the other field men.

While Sinclair apparently spent less time in Arkansas than did Holtzclaw and Armour, it is not clear from the evidence exactly what was the frequency of his work there. He claimed that he went there only once or twice per month in the winter months. That claim, however, is not consistent with the testimony of the other plaintiffs. The assignment to a particular field might add support to the claim, but Holtzclaw testified that Armour also had a general specified area, and Armour went into Arkansas every day during the winter season. While it is apparent that Sinclair made less frequent trips to Arkansas then the others, the similar mileage and driving time indicate that the trips occurred more often than once or twice each month. The Court finds as a fact that Sinclair made irregular but relatively frequent trips to Arkansas, on the order of one per week on the average, in the pickup truck, carrying tools and supplies to perform maintenance and repair work on the Arkansas system.

The Court concludes that all three plaintiffs drove defendant's trucks in interstate commerce, carrying assorted tools, equipment and supplies for repair and maintenance of the pipeline system, and that their driving constituted over half their duties. The plaintiffs' duties, therefore, had a substantial effect on the safety of defendant's operation involving interstate transportation by motor vehicle.

## CONCLUSIONS OF LAW

In 1938, Congress found working conditions substandard for many laborers. The situation, Congress found, *inter alia*, caused a burden on commerce and the free flow of goods in commerce and interfered with the orderly and fair marketing of goods in commerce. 29 U.S.C. § 202(a). Congress then took it upon itself to regulate interstate and foreign commerce in such a manner as to alleviate the deplorable conditions. *Id.* § 202(b). The Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.*, had a two-pronged purpose of establishing a minimum wage and setting forth a maximum workweek beyond which overtime compensation would be due to qualifying employees. 29 U.S.C. §§ 206, 207.

Section 207(a)(1) contains the foundation for the overtime provisions, stating

that "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce . . . for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." The Act, in § 213, exempts certain employers and their employees from its coverage. Subsection (a) allows exemption from both minimum wage and overtime provisions to certain classes of employees. Subsection (b) exempts employees of certain employers and employees engaged in particular industries from the overtime provisions only. Because of the importance of the overtime provisions in fostering the smooth flow of interstate commerce, the employer seeking the exemption bears the burden of proving his entitlement to it. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); *Brennan v. Bill Kirk's Volkswagen*, 497 F.2d 892 (4th Cir. 1974); *Brennan v. Greene's Propane Gas Service, Inc.*, 479 F.2d 1027 (5th Cir. 1973).

The particular exemption with which this suit is concerned is contained in 29 U.S.C. § 213(b)(1):

"The provisions of section 207 of this title shall not apply with respect to—(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49 . . . .".

The so-called "motor carrier exemption" defers the overtime compensation section to the safety provisions of the Interstate Commerce Act, designed to promote safe travel on the nation's highway system. Safety, therefore, is the paramount interest. *Levinson v. Spector Motor Service*, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158 (1947). The maximum hours provisions are intended to prohibit an employee, a driver in this instance, from working above a certain number of hours rather than to compensate him for his excessive hours. Injunction or other penalties, not additional compensation, would be the remedy for the driver or the Secretary. The justification behind this policy was stated simply by Justice Burton in *Levinson v. Spector Motor Service*, 330 U.S. 649, 657, 67 S.Ct. 931, 936, 91 L.Ed. 1158 (1947):

"While a requirement of pay that is higher for overtime service than for regular service tends to deter employers from permitting such service, it tends also to encourage employees to seek it. The requirement of such increased pay is a remedial measure adapted to the needs of an economic and social program rather than a police regulation adapted to the rigid enforcement of a safety program."

There can be no dual coverage by § 207 of the Fair Labor Standards Act and § 304 of the Interstate Commerce Act. The mere possession of the power to regulate by the Secretary was enough, in the *Levinson* case, to exclude the employees in question, checkers of freight loans, from the benefits of § 207. *Levinson v. Spector Motor Service*, 330 U.S. 649, 661, 67 S.Ct. 931, 91 L.Ed. 1158 (1947). He need not actually *exercise* that power. *Southland Gasoline Company v. Bayley*, 319 U.S. 44, 63 S.Ct. 917, 87 L.Ed. 1244 (1943). However, his authority is limited to those employees whose activities affect the safety of operation of motor vehicles transporting property in interstate commerce. *Levinson v. Spector Motor Service*, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158 (1947). The test is not whether a substantial part of the employee's duties affect the safety of interstate operation of motor vehicles. Indeed, in the *Levinson* case Justice Burton specified that the non-safety activities could even constitute a larger portion of his duties than the safety related activities, *id.*, 330 U.S. at 671, 67 S.Ct. 931, so that the character of the activities rather than the proportion of time or activities determines the Secretary's power. *Id.*, at 674–75, 67 S.Ct. 931. The test, then, is whether a particular employee's duties have a substantial effect on the safety of operation of motor vehicles transporting property in interstate commerce. *Id.*, at 656, 67 S.Ct. 931; *Crooker v. Sexton*

10

*Motors, Inc.,* 469 F.2d 206 (1st Cir. 1972); *Yellow Transit Freight Lines, Inc. v. Balven,* 320 F.2d 495, 498 (8th Cir. 1963). Furthermore, once the Court determines the status of the employee's exemption, his work is no longer allocated between exempt and non-exempt activities. Hence, the exemption applies for all workweeks, even those in which the employee did not venture into interstate commerce. *Kerr v. Jeans,* 193 F.2d 572 (5th Cir. 1952); 29 C.F.R. § 782.2(b)(3) and its predecessor in 29 C.F.R. § 782.

The question for the instant case, then, becomes whether the Secretary of Transportation has authority over employees similarly situated to the field men employed by Beacon. Section 304 of Title 49 contains authorization to regulate common, contract and private carriers by motor vehicle. A cursory examination of 49 U.S.C. § 303(a)(14) (common carrier) and § 303(a)(15) (contract carrier) reveals that Beacon could not fall into either category. The Secretary may regulate it as a private carrier or not at all. 49 U.S.C. § 303(a)(17) defines the term "private carrier of property by motor vehicle" as:

"any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

The Secretary's authority then is contained in 49 U.S.C. § 304(a)(3) to establish, for private carriers of property by motor vehicles, qualifications, maximum hours of service, and standards of equipment.

■ In 1971, the Secretary did promulgate safety regulations. See 49 C.F.R. § 390.1, *et seq.* While they could not have the effect of law during the entire course of the instant case, they illustrate the existence of the power in the Secretary so to do. It is the existence of that power, not the exercise of it, that is determinative of the

exemption. The scope of the power extends to the employees who drive the vehicles of the private carrier, because their activities are an integral part of the service of the carrier. *Morris v. McComb,* 332 U.S. 422, 433, 68 S.Ct. 131, 92 L.Ed. 44 (1947). The power even extends to non-driving activities because "it is essential to establish reasonable requirements with respect to [a driver's] qualifications and activities at all times in order that the safety of operation of his truck may be protected during those particular hours or days when, in the course of his duties as its driver, he does the particular acts that directly affect the safety of its operation." *Levinson v. Spector Motor Service,* 330 U.S. 649, 675–76, 67 S.Ct. 931, 944, 91 L.Ed. 1158; *Southland Gasoline Company v. Bayley,* 319 U.S. 44, 63 S.Ct. 917, 87 L.Ed. 1244 (1943). Clearly, then, drivers of motor vehicles of private carriers of property by motor vehicle are not entitled to overtime compensation under 29 U.S.C. § 207(a)(1).

■ The question remains whether a natural gas well servicing company whose drivers carry tools and equipment in company-furnished pickup trucks across state lines is a private carrier of property by motor vehicle. An examination of *Harshman v. Well Service, Inc.,* 248 F.Supp. 953 (W.D.Pa. 1964), *aff'd per curiam,* "for the reasons so well stated in the opinion of Judge Marsh," 355 F.2d 206 (3rd Cir. 1965), reveals that it is.

The *Harshman* case is nearly on all fours with the instant suit. Defendant serviced and repaired oil and gas wells in West Virginia, Ohio and Pennsylvania, with a work base in Pennsylvania. The plaintiffs drove specially equipped trucks across state lines to do maintenance and repair work. The Court directly addressed the question of whether the equipment on the trucks constituted "property" under the Interstate Commerce Act. Although the Court had some difficulty with the argument that some of the equipment was permanently affixed so as to become "unitized" with the truck, it dismissed that argument and concluded further that *auxiliary portable*

*equipment* carried on the trucks did constitute property owned by the defendant. He also stated that it was transported across state lines in furtherance of defendant's commercial enterprise. *Harshman v. Well Service, Inc.*, 248 F.Supp. 953, 958 (W.D.Pa. 1964).

The only possible distinction between *Harshman* and the case at bar lies in the fact that the trucks in *Harshman* were specially equipped. That fact, however, did more to defeat a finding of property than enhance it; thus, any distinction on that basis would run in favor of a finding that the trucks in the instant case were carrying "property" within the context of the motor carrier exemption.

The only remaining argument at law for plaintiffs is that their duties were so insubstantial as to come within the *de minimis* exception of *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184 (1947). Plaintiff cites *Pyramid*, *Wirtz v. C & P Shoe Corp.*, 336 F.2d 21 (5th Cir. 1964), and *Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37 (5th Cir. 1962) in support of their proposition.

In *Pyramid*, the United States Supreme Court applied a *de minimis* rule to persons who merely loaded and unloaded freight at a single point. 330 U.S. at 708, 67 S.Ct. 954. In *Opelika*, the United States Court of Appeals for the Fifth Circuit applied the rule to warehousemen with similar duties. 299 F.2d at 42–43. It went on, however, to conclude that *driver-helpers* were entitled to the exemption. *Id.*, at 43. Likewise, *Wirtz* dealt only with warehouse employees who had no connection with the motor vehicles themselves.

In none of the cases cited by plaintiff was a *driver* held non-exempt under the *de minimis* rule. Indeed, in only one case found by this Court, not cited by plaintiff, has such a conclusion been reached. In *Coleman v. Jiffy June Farms, Inc.*, 324 F.Supp. 664 (S.D.Ala.1970), the Court found the *interstate* activities of the drivers in question were *de minimis* because it found that each driver, on average, spent only .00343 per cent of his time in interstate activity. Un-

der this Court's finding of fact, *Coleman* simply cannot stand applicable to the case at bar. Thus, this Court has found no applicable case in which the *de minimis* rule has been applied to a driver. In *Cooker v. Sexton Motors, Inc.*, 469 F.2d 206 (1st Cir. 1972), the Court, dealing with a driver, spoke of the *de minimis* rule:

"The *de minimis* rule has been applied in this context where the employee's connection with anything affecting interstate motor carrier operations was so indirect and casual as to be trivial. . . The activities of one who drives in interstate commerce, however frequently or infrequently, are not trivial." *Id.*, at 210.

Clearly, then, the *de minimis* rule should seldom, if ever, be applied to one who drives a motor vehicle carrying property of a private carrier in interstate commerce.

## APPLICATION OF LAW TO FACTS

In view of the facts previously found by this Court and the above discussed principles of law, the following conclusions are inevitable as respects the instant case:

1. Defendant Beacon Gasoline Company is a private carrier of property by motor vehicle in interstate commerce in furtherance of its commercial enterprise.

2. Plaintiffs' duties, as drivers, directly and substantially affect the safety of defendant's interstate motor vehicle operations, and those duties are not *de minimus*.

3. Plaintiffs and defendant are therefore subject to regulation by the Secretary of Transportation as drivers and a private carrier of property by motor vehicle.

4. Plaintiffs and defendant are not covered by the Fair Labor Standards Act's overtime compensation provision, but rather are exempted therefrom.

5. Plaintiffs therefore are not entitled to overtime compensation as prayed in their petition.

6. The foregoing shall constitute this Court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.