JAMES L. DENNIS, Circuit Judge,
dissenting:
I respectfully dissent because the district court and the majority of this court have departed from controlling Supreme Court and circuit precedent and have misinterpreted and misapplied Department of Labor (“DOL”) regulation 29 C.F.R. § 782.2(a) and this court’s decision in Songer v. Dillon Resources, Inc., 618 F.3d 467 (5th Cir.2010), to except more than a hundred employees from overtime wage protection under the Fair Labor Standards Act (“FLSA”).
The issue is whether the Motor Carrier Act (“MCA”) exemption to the FLSA excepts the oil-well-service plaintiffs-employees here from overtime protection because their individual job activities can conceivably affect the safety of interstate trans *289 portation. If an employee is subject to the jurisdiction of the Department of Transportation (“DOT”) under the MCA to regulate the qualifications and maximum hours of service of the employee, then that employee loses the FLSA’s protection over overtime pay. An employee is subject to such MCA jurisdiction only, inter alia, if he is reasonably likely to carry out job duties affecting the safety of interstate transportation (or international transportation, although such is not involved in this case).
In Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184 (1947), the Supreme Court held that, when the MCA exemption is invoked as a defense in an FLSA action for overtime pay, (1) the district court must “determine whether or not the activities of each [employee]” are reasonably likely to affect the safety of interstate transportation and that (2) the court may declare exempt from overtime wage protection only “those [employees] who are engaged in such activities.” Id. at 707-08, 67 S.Ct. 954 (emphasis added).[1] Later that same year, in Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947), the Court reaffirmed that, in “an action to recover overtime compensation for individual employees,” it is “necessary to determine” “the extent to which” an employee seeking overtime pay carried out activities reasonably likely to affect the safety of interstate transportation. Id. at 430, 68 S.Ct. 131.
Thus, under the Supreme Court’s jurisprudence, MCA jurisdiction turns on the individual job circumstances of “each” employee seeking overtime pay. Pyramid Motor Freight Corp., 330 U.S. at 707, 67 S.Ct. 954. An employee loses the FLSA’s protection over overtime pay under the MCA exemption only if the employee, based on the circumstances of his job, is reasonably likely to carry out activities affecting the safety of interstate transportation operations. See also Mitchell v. C. & P. Shoe Corp., 286 F.2d 109, 114 (5th Cir.1960) (holding that MCA jurisdiction turns on the “activities of the particular employee, rather than the employer”); accord Opelika Royal Crown Bottling Co. v. Goldberg, 299 F.2d 37, 42-43 (5th Cir.1962). The Supreme Court’s jurisprudence requiring individual analysis of each employee’s actual job circumstances for purposes of the MCA exemption has not been overruled or modified.
Here, however, the district court and the majority have failed to focus on the circumstances of each employee’s actual job, as required by law, to determine whether that employee is exempted from overtime wage protection. Instead, they have erroneously concluded that, when a district court deems multiple employees’ job duties and assignments to be, in the court’s opinion, “sufficiently similar,” the court may lump all of the employees together in a single “group” (the district court’s word) or “class” (the majority’s word)[2] so as to determine on a “company-wide basis” the applicability of the MCA exemption “to that group as a whole.” 846 F.Supp.2d 678, 694-95; ante, at 285-86. According *290 to the district court, this “group”-based analysis that is conducted on a “company-wide basis” allows the court to look at the job activities of the national company’s Wyoming employees, who are not parties to this litigation seeking overtime pay, and to declare that, based on their activities, the Texas and Louisiana employees in this case are exempted from overtime wages. The district court recognized that, factually, the Wyoming employees are distinct from the Texas and Louisiana employees. Specifically, the district court recognized that, as a matter of fact, the Wyoming employees are very likely to affect the safety of interstate transportation in the course of their jobs and the Texas and the Louisiana employees are not. Nevertheless, the district court concluded that, as a result of “company-wide,” “group-based” analysis, the Wyoming employees, who are not seeking overtime wages in this case, and the Texas and Louisiana employees, who are, should all be lumped together and should all be denied overtime wage protection despite their factual differences. The majority of this court now affirms.[3]
Thus, in granting and affirming summary judgment for Coil Tubing Services, the employer here, my colleagues mistakenly have failed to require the employer to carry its heavy burden under its affirmative MCA exemption defense to show, on an individual basis, that each employee’s job activities demonstrate that he is exempt from FLSA overtime protection. As support for this “group”- or “class”-based analysis that is conducted on a “company-wide basis,” the district court and majority point to the DOL’s § 782 regulations and this court’s recent Songer decision. The district court and the majority, unfortunately, have misread these sources. The DOL’s § 782 regulations and Songer did not abrogate, nor could they have abrogated, the Supreme Court’s jurisprudence requiring individual analysis of each employee’s job circumstances. Because the district court’s legal errors skewed and undermined its entire decision, its summary judgment should have been reversed rather than affirmed.
I. Introduction
Under the FLSA, employers are generally prohibited from “employ[ing] any of *291 [their] employees” “for a workweek longer than forty hours unless such employee receives [time-and-a-half compensation for the overtime hours].” 29 U.S.C. § 207(a)(1).[4] Under the MCA exemption to the FLSA, that entitlement to overtime pay “shall not apply with respect to” “any employee with respect to whom the Secretary of Transportation [that is, the DOT] has power[5] to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 [that is, the MCA].” Id. § 213(b)(1). Thus, under the FLSA, an employee is entitled to overtime pay unless the employee falls within the scope of the DOT’s regulatory jurisdiction under the MCA or is otherwise exempt from the FLSA for reasons not involved in this case.[6]
MCA jurisdiction (that is, the jurisdiction of the DOT under the MCA to establish the qualifications and maximum hours of service of employees) has three elements. First, under 49 U.S.C. § 31502(b), *292 the DOT may regulate the qualifications and maximum hours of service of only those workers who are employed by either a “motor carrier” or a “motor private carrier.”[7] A “motor carrier” is “a person providing motor vehicle transportation for compensation.” Id. § 13102(14). A “motor private carrier” is generally a person who transports his own property “for sale, lease, rent, or bailment or to further a commercial enterprise.” Id. § 13102(15).[8]
Second, the DOT’S jurisdiction “is limited to those employees whose activities affect the safety of [the transportation] operation,” and the DOT “has no jurisdiction to regulate the qualifications or hours of service of any others.” United States v. Am. Trucking Ass’ns, 310 U.S. 534, 553, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). To determine whether an employee’s job activities affect the safety of the transportation operation, the courts have clarified the relevant inquiry to be whether “the employee’s job duties are such that he is (or is likely to be) called upon in the ordinary course of his work to perform safety-affecting activities.” E.g., Songer, 618 F.3d at 474 (quoting 29 C.F.R. § 782.2(b)(3)) (alteration omitted). Put another way, the question is whether the employee “can be reasonably expected” to engage in activities that affect the safety of transportation. Id. If the likelihood of engaging in safety-affecting activities is too remote and improbable, then the employee will not fall under MCA jurisdiction. Coleman v. Jiffy June Farms, Inc., 324 F.Supp. 664, 670 (S.D.Ala.1970), aff'd, 458 F.2d 1139 (5th Cir.1971); Kimball v. Goodyear Tire & Rubber Co., 504 F.Supp. 544, 548 (E.D.Tex.1980); Yaklin v. W-H Energy Servs., Inc., No. 07-CV-422, 2008 WL 4692419, at *6 (S.D.Tex. Oct. 22, 2008).[9]
Third, the DOT’s jurisdiction reaches only (1) international transportation, ie., transportation that crosses the national border, (2) interstate transportation, ie., transportation that crosses state borders, or (3) intrastate transportation of goods in the flow of interstate commerce. 49 U.S.C. §§ 31502(a), 13501; Songer, 618 F.3d at 472.[10] Generally speaking, there *293 must be an international or interstate nexus of some sort, as the DOT’S jurisdiction does not reach purely intrastate transportation. E.g., Kline v. Wirtz, 373 F.2d 281, 282 (5th Cir.1967); Walling v. Comet Carriers, 151 F.2d 107, 110 (2d Cir.1945).
In sum then, under the MCA, the DOT may regulate the qualifications and maximum hours of service only for (1) employees of a “motor carrier” or “motor private carrier” (2) whose activities affect the safety of transportation, (3) and that transportation has an international or interstate nexus.
Here, there is no question of the first two elements. First, there is no question that Coil Tubing Services, an oil-well-service company, requires its employees in the course of their jobs to transport the company’s property, including chemicals, tools, and coil tubing equipment, between the company’s district offices and the job-sites, the customers’ wells, and therefore qualifies as a “motor private carrier” under the statute. See Sinclair v. Beacon Gasoline Co., 447 F.Supp. 5, 10 (W.D.La.1976), aff'd, 571 F.2d 978 (5th Cir.1978) (holding that “a natural gas well servicing company whose drivers carry tools and equipment in company-furnished pickup trucks ... is private carrier of property by motor vehicle”). Second, although the principal job of the employees here is to service the customers’ oil wells and that, by itself, does not have an affect on the safety of transportation, the employees also transport Coil Tubing Services’s property, i.e., the equipment, etc., to the jobsite via motor vehicle, and “[i]t is obvious that one who drives a vehicle” “directly affects the safety of such operations as long as he is driving.” Crooker v. Sexton Motors, Inc., 469 F.2d 206, 209 (1st Cir.1972); see also Songer, 618 F.3d at 473. Thus, there is no question that, as the employees here are required to drive motor vehicles, they affect the safety of transportation when doing so. The third requirement for MCA jurisdiction is the interstate nexus, i.e., that the employee’s job activities are such that the employee is reasonably likely to affect the safety of interstate, not merely intrastate, transportation.[11] Whether each employee here is reasonably likely to drive interstate and thus affect the safety of interstate transportation is the disputed issue in this case.
II. The District Court’s and Majority’s Flawed “Group”- or “Class”-Based Analysis
A.
From November 2005 through November 2008, Coil Tubing Services employed the 191 plaintiffs-appellees in this case as “field service employees” tasked with ser *294 vicing clients’ oil wells. During the relevant period, the company organized its business into six “districts”: the “Alice,” “Angleton,” and “Bridgeport” districts in Texas, the “Broussard” and “Bossier City” districts in Louisiana, and the “Rock Springs” district in Wyoming. However, none of the plaintiffs in this case worked out of the Bossier City or Rock Springs districts; they all worked out of the Alice, Angleton, Bridgeport, and Broussard districts. See 846 F.Supp.2d at 686 (listing employees, titles, district assignments, and start and end dates of Bellwether plaintiffs).
Initially, in its first summary-judgment ruling that was later vacated and supplanted by the decision now under review,[12] the district court held that there was a reasonable likelihood of employees in the Angle-ton and Broussard districts driving interstate, and, thus, they fell under the MCA and were not entitled to FLSA overtime pay. But, the district court further held that the likelihood of employees in the Alice and Bridgeport districts driving interstate was “so low” that there was not an “objectively reasonable expectation” of those employees driving interstate, and, thus, they did not fall under the MCA exemption. Coil Tubing Services argued that employees in all of the districts should fall under the MCA because, in all of the company’s districts nationwide, approximately seven percent of the “land project” (as opposed to offshore) jobs “required one or more service crews to mobilize coil tubing equipment across state lines.” But the district court, in its first decision, agreed with the plaintiffs that the company’s seven percent “aggregate” figure was “skewed by the extremely large number of interstate projects handled by the Rock Springs District” in Wyoming, in which none of the plaintiffs actually worked. “More than 56% of the Rock Springs projects were out-of-state,” the district court explained, “while the other districts had far fewer interstate projects.” By contrast, the district court proceeded to explain, in Alice and Bridgeport, less than one percent of the jobs handled in those districts during the relevant time were interstate; in Angleton, less than two percent of the jobs were interstate; and, in Broussard, around five percent of the jobs were interstate.
After the district court’s first ruling, Coil Tubing Services moved the court to reconsider, and the court did. In its second decision, which is now under review, the district court cited regulations, codified at 29 C.F.R. § 782, of the DOL, the agency charged with enforcing the FLSA. 846 F.Supp.2d at 690.[13] Those regulations of the DOL set out “the construction of the law [regarding the MCA exemption] which the [DOL] believes to be correct.” 29 C.F.R. § 782.0. The regulations state, *295 “[t]he [MCA exemption] depends both on the class to which his employer belongs and on the class of work involved in the employee’s job.” Id. § 782.2(a). And they proceed to explain:
The power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees, on which exemption depends, extends to those classes of employees and those only who: (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act, and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.
Id. (citations omitted).
Based on § 782’s language regarding “classes of employees” and the “class of work involved in the employee’s job,” the district court concluded that it should not address whether “the activities of each individual employee in issue directly affected the safety or operation of commercial motor vehicles in interstate transportation.” 846 F.Supp.2d at 694 (emphasis added). Rather, the district court concluded that it must apply a “group analysis” on a “company-wide basis.” Id. at 694-95.
To conduct such a “group analysis” on a “company-wide basis,” the district court defined a “group” of Coil Tubing Service employees that it named “field service employees.” Id. at 684. The court defined that “group” to encompass all of Coil Tubing Services’s employees that had “job duties and assignments” that, in the court’s opinion, were “sufficiently similar to permit some grouping.” Id. at 694-95. Then, the district court turned to the fact that seven percent of all jobs company-wide were interstate (that is, the aggregate figure that the district court had previously rejected as “skewed”) and reasoned that — even though the seven percent figure did not accurately represent the experience of the company’s Texas and Louisiana employees — it nevertheless somehow applied to the Texas and Louisiana employees under the district court’s “company-wide” “group analysis.” Id. at 703-04 & n. 48. Accordingly, the district court held1 that seven percent of jobs company-wide being interstate was sufficient to subject all employees, regardless of their districts, in the “field service employees” “group” to MCA jurisdiction and granted summary judgment to Coil Tubing Services regarding the FLSA overtime pay claims of every employee in the judicially defined “group.” Id. at 703, 715.[14] In essence, the district court held that, because the company has employees in Wyoming who very frequently carry out duties affecting the safety of interstate transportation but are not parties to this case, that somehow creates a legal fiction that the plaintiffs here, the company’s employees in Louisiana and Texas, are deemed to also carry out those same duties just as often. The district court decided such even though the evidence showed it to be false.
Now, the majority affirms the district court’s analysis and, in a published opinion, sets it as the law of this circuit. According to the majority, to determine whether employees are subject to MCA jurisdiction, courts should use an “extensive individualized methodology” to include all of a com *296 pany’s employees with “sufficiently similar duties” (in the court’s opinion) in a judicially defined “class” of employees and then decide whether such “class,” rather than the individual employees within it, has a reasonable expectation of carrying out activities that affect the safety of interstate transportation. Ante, at 285-86. Without getting into the details about who exactly is in the “class” here and what connection they have to the ease, if any, the majority affirms the district court’s analysis. See id[15]
In short, in deciding MCA jurisdiction (specifically, whether an employee’s job duties are reasonably likely to affect the safety of interstate transportation), the district court and the majority of this court agree that, if employees have “sufficiently similar” job duties, the court may lump them all together into a single “group” or “class” and then decide the jurisdictional question with respect to the “group” or “class” rather than the individual employees in it. This is wrong. Contrary to the district court and the majority, an employee is exempt from FLSA overtime protection only if the MCA applies to that employee individually — i.e., that employee’s actual job circumstances are such that the employee is reasonably likely to affect the safety of interstate transportation. The relevant Supreme Court and circuit precedent requires individual analysis of the employee’s actual job and prohibits the district court’s and majority’s “group”- or “class”-based analysis.
It appears that the district court and the majority have adopted their improper analysis based on two misunderstandings about the jurisprudence. First, the district court and majority appear to believe that the DOL’s regulations codified at 29 C.F.R. § 782.2, which refer to “classes of employees,” authorize the “group”- or “elass”-based analysis that they applied here. See 846 F.Supp.2d at 690 (citing § 782.2(a)); ante, at 283-84 (same). Second, the district court and majority also contend that their “group”- or “class”based analysis is required by Songer v. Dillon Resources, Inc., a 2010 decision of this court. See 846 F.Supp.2d at 694 (citing Songer); ante, at 284-86 (same). They are mistaken on both points. The history of the FLSA and MCA, to which I now turn, clearly indicates that the MCA exemption has always turned on the job circumstances of each individual employee.
B.
1. The Statutory Enactments
The MCA was enacted in 1935 “to regulate transportation by motor carriers.” § 202(a), 49 Stat. 543. When first enacted, the statute was enforced not by the DOT, which was not created until decades later, but by a predecessor agency, the Interstate Commerce Commission (“ICC”). §§ 203(a)(3), 204.
*297 During the initial years following the ICC’s creation in 1935, the agency promulgated a series of regulations imposing certain rules regarding the qualifications and maximum hours of service for certain workers, but the agency did not issue any formal determinations as to what it perceived to be the scope or the reach of its regulatory authority. For example, in 1936, the year after the MCA was enacted, the ICC promulgated its first regulations establishing qualifications for certain drivers while expressing no view on the ICC’s authority to regulate workers other than drivers. See Ex parte No. MC-4, 1 M.CC. 1.
In 1938, the FLSA was enacted to “eliminate” “labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.” § 2, 52 Stat. 1060. In its original form, the FLSA contained, as it still does today, the MCA exemption. § 13(b)(1) (“The provisions of section 7 shall not apply with respect to any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935.”).
2. The Interstate Commerce Commission’s Jurisdictional Pronouncements
The MCA exemption in the FLSA “brought sharply into focus the coverage of employees by the Motor Carrier Act.” Am. Trucking Ass’ns, 310 U.S. at 540, 60 S.Ct. 1059. In 1938, the ICC, noting that the FLSA had made the question of its jurisdiction important, instituted proceedings “for the purpose of determining the extent of our jurisdiction under section 204(a) of the Motor Carrier Act, 1935, to establish reasonable requirements with respect to qualifications and maximum hours of service of employees of common and contract carriers and of private carriers of property by motor vehicle.” Ex parte No. MC-28, 13 M.C.C. 481, 481 (1939). The ICC described the dispute before it as follows:
Representatives of common and contract carriers, with one exception, assert that our jurisdiction under section 204(a)(1) and (2) extends to all employees of common and contract carriers and is not limited to those employees whose activities affect the safety of operation. Representatives of organized labor, on the other hand, contend that our jurisdiction is limited to employees whose activities affect the safety of operation.
Id. at 482. In 1939, the ICC sided with organized labor and announced that the agency’s jurisdiction extends only to those employees “whose activities affect the safety of operation of motor vehicles engaged in transporting passengers and property in interstate and foreign commerce.” Id. at 488. That, however, left open the question, what sorts of employees have activities that affect the safety of operation? In that regard, the ICC wrote:
It is clear to us that we have power to prescribe qualifications and maximum hours for drivers and their helpers employed by private carriers of property who are engaged in driving or operating motor vehicles transporting property in interstate and foreign commerce. It may be that the activities of other employees are such that “to promote safety of operation” we have power to prescribe qualifications and maximum hours of service for them. As to what classes or types of employees, if any, may be included in this category, we do not decide here.
Id. at 483.
This, it appears, was the first time the phrase “classes of employees” (to be pre *298 cise, “classes or types of employees”) appeared in the law books in connection with the MCA. Here, the ICC used the phrase to refer to categories of job duties and to distinguish between those duties that affect the safety of operation (and thus fall within the ICC’s jurisdictional ambit) and those that do not (and thus do not). The ICC thought it clear that “drivers” and “their helpers” are “classes or types of employees” that affect the safety of operation but did not decide “what [others], if any, may be included in this category.” M[16]
In 1941, the ICC began looking at other classes of employees, specifically, “mechanics and other garage workers,” “loaders,” and “dispatchers.” Ex parte No. MC-2, 28 M.C.C. 125, 132. As for “mechanics,” the ICC concluded that they “devote a large portion of their time to activities which directly affect the safety of operation of motor vehicles operated in interstate or foreign commence” and, thus, fall within the ICC’s jurisdiction. Id. at 133. But, as for “other garage employees,” such as “men who do nothing but paint vehicles,” their work, the ICC concluded, does not affect the safety of operation, and thus, the ICC may not regulate them. Id. As for “loaders,” “whose sole duties are to load and unload motor vehicles and transfer 'freight between motor vehicles and between the vehicles and the warehouse,” they too fell within the ICC’s jurisdiction, the agency concluded, because “[t]he evidence makes it entirely clear that a motor vehicle must be properly loaded to be safely operated on the highways of the country.” Id. at 133-34. But “dispatchers,” the ICC concluded, do not affect the safety of operations. Id. at 135. And, the ICC reaffirmed its prior determination that “driver’s helpers,” like the drivers themselves, affect safety of operations. Id. at 136. In determining that “mechanics,” “loaders,” and “driver’s helpers” carry out job duties that affect the safety of transportation, the ICC carefully defined what it meant by each of those terms, delineating who should, and who should not, be considered each. Finally, the ICC concluded that no other employees of motor carriers and motor private carriers besides “drivers and those classes of employees” already discussed “perform duties which directly affect safety of operation.” Id. at 139. In sum, in 1941, the ICC determined that “drivers,” their “helpers,” “mechanics,” and “loaders,” as thoroughly defined by the Commission, all carry out duties affecting safety of operation and thus fall under MCA jurisdiction, and all other employees of “motor carriers” and “motor private carriers” do not.[17]
3. The Supreme Court’s 1947 Trilogy
In 1947, the Supreme Court established several important legal principles relating to the ICC’s jurisdiction under the MCA. First, in Levinson v. Spector Motor Service, 330 U.S. 649, 67 S.Ct. 931, the Court held that the ICC’s “findings of fact” re *299 garding whether particular job activities affect safety of operations were “squarely within the jurisdiction of the Commission” and were entitled to great deference. See id. at 669, 672-73, 67 S.Ct. 931 (describing the findings of fact as having a “claim to finality” and stating that, “[w]e see no reason to question [the ICC’s] considered conclusion that the activities of full-duty drivers, mechanics, loaders, and helpers, as defined by it, affect safety of operation of the carriers by whom they are employed”).[18]
Second was Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 696, 67 S.Ct. 954, a companion case to Levinson. In Pyramid Motor Freight Corp., the defendant-employer invoked the MCA defense, contending that the plaintiffs-employees fit into the ICC’s definitions of “loaders” and, thus, fell under the MCA exemption. The district court dismissed the case, holding that determination of whether the employees carry out job duties that affect safety of operation was not the role of the court, but was rather a task for the ICC. 59 F.Supp. 341, 343-44 (1945). The Supreme Court rejected the district court’s conclusion that the determination should be referred to the ICC because, in Ex Parte No. MC-2, the ICC had already defined the “loaders” job classification subject to MCA jurisdiction. 330 U.S. at 706-07, 67 S.Ct. 954.
Under these circumstances, there is no occasion for us to refer to the Commission any question presented in this case.... The District Court must determine simply whether or not the respec-five employees who seek to recover overtime compensation under [the FLSA] are excluded from [doing so] because they are within the above classification [“loaders”].
Id. at 707, 67 S.Ct. 954. Accordingly, the Supreme Court remanded to the district court and, importantly, ordered the district court to “determine whether or not the activities of each [employee], either as a whole or in substantial part, come within the Commission’s definition of the work of a ‘Loader.’” Id. (emphasis added). The Court proceeded to explain that, “[i]f none of the ... activities of the respective respondents, during the periods at issue, come within the kind of activities which, according to the Commission, affect the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the Motor Carrier Act, then those [employees] of which that is true are entitled to [overtime pay under] the Fair Labor Standards Act.” Id. at 708, 67 S.Ct. 954 (emphasis added). “On the other hand, if the whole or substantial part of [the] activities of the respective respondents, during the periods at issue, do come within the kind of activities which, according to the Commission, affect such safety of operation, then those respondents who are engaged in such activities are excluded from [overtime pay].” Id. (emphasis added). In short, the Court held in Pyramid Motor Freight Corp. that, in an FLSA action in which the MCA exemption is asserted as a defense, the role of the court is to determine separately whether the activities of “each” employee affect the *300 safety of interstate transportation, and the court may deny overtime pay only to “those [employees] who are engaged in such activities.” Id.
The third and final decision in the Supreme Court’s 1947 trilogy was Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131. The question presented was whether an employee who spends most of his time at work carrying out duties that do not affect safety of transportation and only a fraction of his time carrying out activities that do falls under the MCA. Id. at 426, 68 S.Ct. 131. There, the evidence in the record showed that the employer, a cartage business, employed drivers to transport property. Id. at 427, 68 S.Ct. 131. About four percent of the company’s jobs involved the transportation of goods moving in interstate commerce. Id. at 432-33, 68 S.Ct. 131. The company assigned those jobs to the drivers “indiscriminately.” Id. at 433, 68 S.Ct. 131. The Court held that, in such circumstances, where about four percent of a company’s transportation jobs with an interstate nexus are shared indiscriminately among the company’s drivers, thus making the interstate commerce trips a “natural, integral, and apparently inseparable part” of each driver’s job, that amount of interstate driving was sufficient to invoke MCA jurisdiction for those drivers. Id. at 433-34, 68 S.Ct. 131.[19]
Importantly, Morris also reaffirmed Pyramid Motor Freight Corp. ’s requirement of individual analysis of each employee’s job activities. In Morris, the DOL, which had brought the suit, did not seek to recover unpaid overtime that was due to any particular employee, but rather sought only an injunction against the company to pay overtime in the future to any employees who would not, because of his job duties, fall under the ICC’s definition of a “class of work” invoking MCA jurisdiction (ie., drivers, their helpers, mechanics, and loaders) without deciding whether any particular employee fell under such a class. Id. at 424-25, 430, 68 S.Ct. 131. The Court stated that, “if this were an action to recover overtime compensation for individual employees,” “it would be necessary to determine” “the extent to which” the employees carried out job duties affecting the safety of transportation. Id. at 430, 68 S.Ct. 131. See also Troutt v. Stavola Bros., Inc., 107 F.3d 1104, 1109 (4th Cir.1997) (observing that Morris “followed the same approach articulated in Pyramid”).
Thus, the legal regime after 1947, created by the ICC’s jurisdictional pronouncements and the Supreme Court’s decisions, provided that (1) the ICC’s jurisdiction under the MCA reached only each employee whose activities affect the safety of interstate transportation operations (Am. Trucking Ass’ns, 310 U.S. at 553, 60 S.Ct. 1059), (2) it fell to the ICC to determine which sorts of job activities affect safety of such operations, and the ICC had done that (Levinson, 330 U.S. at 669, 672-73, 67 S.Ct. 931), and (3) in an FLSA action for overtime pay, it was the duty of the courts to determine through the “judicial process” whether each plaintiffs job involved, wholly or in sufficient part, a “class of work” that the ICC had determined affected interstate transportation safety (Pyramid Motor Freight Corp., 330 U.S. at 698, 707, 67 S.Ct. 954; see also Morris, 332 U.S. at 430, 68 S.Ct. 131). And that, according to the Supreme Court, is where things stand today. Since 1947, the Supreme Court has never again addressed the MCA exemption.
*301 4. This Circuit’s Post-1947 Jurisprudence
In the decades following the Supreme Court’s 1947 trilogy, this court understood Pyramid Motor Freight Corp.’s teaching, that MCA jurisdiction vel non turns on the individual employee’s job duties. In Mitchell v. C & P Shoe Corp., 286 F.2d 109 (5th Cir.1960), we said:
Because of the view it took of the matter, the court below made no findings on the question of whether the individual plaintiffs devoted a ‘substantial’ part of their work to the interstate operations of the C & P Shoe Corporation. Since it is activities of the particular employee, rather than the employer, which determine coverage, we remand the case for such findings.
Id. at 114 (emphasis added, footnote omitted).[20]
Two years later, in Opelika Royal Crown Bottling Co. v. Goldberg, 299 F.2d 37 (5th Cir.1962), this court held that some of the employer’s employees fell under the MCA because of their job duties, but other of the employer’s employees did not, because of their individual job duties. See id. at 42-43.
Until today, the district courts in this circuit have, as we did in Opelika Royal Crown Bottling Co., determined MCA jurisdiction on an employee-by-employee basis, turning separately on each individual employee’s job activities. See, e.g., McCann v. W.C. Pitts Constr. Co., No. 3:10-CV-52, 2011 WL 3924855, at *8 (S.D.Miss. Sept. 7, 2011); Villegas v. Dependable Constr. Servs., Inc., No. 4:07—CV-2165, 2008 WL 5137321, at *24-26 (S.D.Tex. Dec. 8, 2008).
In 2010, this court decided Songer, 618 F.3d 467, which, the majority says, “effectively forecloses an employee-by-employee analysis.” Ante, at 284; see also 846 F.Supp.2d at 694. This is a misunderstanding of the case. If the majority were correct, it would mean that the case worked a revolution in the Supreme Court’s jurisprudence. Songer could not “foreclose[ ] an employee-by-employee” analysis because the Supreme Court, in Pyramid Motor Freight Corp., held that employee-by-employee analysis is required, as did prior panels of this court in Mitchell and Opelika Royal Crown Bottling Co., and none of those decisions has been overruled; nor has any statute been amended in a manner that is contended to have altered the requisite individual employee analysis.
In Songer, the plaintiffs-employees were full-time truck drivers. 618 F.3d at 468. Their employer had a number of routes, many of which were interstate, and no driver was assigned a dedicated route. Id. at 470, 475-76. Routes were assigned by a single “dispatch service” “indiscriminately — i.e., any driver could be called upon at any time to make an interstate or intrastate trip.” Id. at 470. “The drivers’ employment could be terminated if they refused an assignment.” Id. “In other words, any driver could have been assigned to an interstate trip.” Id. at 475. Accordingly, the evidence showed that “all the drivers,” all of whom accepted routes from the same dispatch service, had a reasonable likelihood of driving interstate. Id. at 476.
Nowhere in Songer’s analysis did this court make a determination of reasonable likelihood vel non of driving interstate by dint of an employee’s membership in any sort of judicially defined “group” or “class,” as the district court and the major *302 ity did here. In Songer, this court simply-made the common sense observation that, because of company policies that were factually common to all employees (ie., the indiscriminate assignment of interstate trips), each and every employee, all of whom had the same likelihood of driving interstate, was reasonably likely to drive interstate. See id. at 470 (“any driver could be called upon at any time to [drive] interstate”) (emphasis added). Cf. Brennan v. Schwerman Trucking Co. of Va., Inc., 540 F.2d 1200, 1205 (4th Cir.1976) (holding that, because interstate and intrastate trips were assigned indiscriminately among the company’s drivers, “each of [the] drivers may affect the safety of operation of motor vehicles engaged in interstate commerce”) (emphasis added). In other words, Songer, no differently than any other case before it, did nothing more than examine the relevant evidence to make an individual determination as to MCA jurisdiction with respect to each employee, based on the circumstances of that employee’s job.
In sum, following the Supreme Court’s 1947 trilogy, this court has, in accordance with Pyramid Motor Freight Corp. ’s mandate, determined MCA jurisdiction on an individual basis, turning on each employee’s actual job circumstances.
5. Other Circuits’ Post-1947 Jurisprudence
After 1947, at least three of our sister circuits have, like us, acknowledged Pyramid Motor Freight Corp. ’s requirement for individual analysis of each employee’s actual job duties. The Third Circuit has stated that, to determine MCA jurisdiction, the court must determine “whether each plaintiff, during the relevant time periods, performed duties which substantially affected the safety of operation.” Harshman v. Well Serv., Inc., 248 F.Supp. 953, 958 (W.D.Pa.1964) (emphasis added), aff'd, 355 F.2d 206 (3d Cir.1965) (affirming “for the reasons so well stated in the opinion of [the district court]”). The Fourth Circuit likewise agrees that the court must focus on the employee’s actual activities “on an individual basis.” Troutt, 107 F.3d at 1107-10. And, the Seventh Circuit has explained that it is erroneous to determine MCA jurisdiction on the basis of “the employer’s operations” because MCA jurisdiction “depends upon the activities of the individual employees.” Goldberg v. Faber Indus., Inc., 291 F.2d 232, 234-35 (7th Cir.1961) (emphasis added).
6. The Department of Labor Regulations and Other Post-1947 Developments
In 1948, the DOL, which was then (and is still now) charged with enforcing the FLSA, see § 4, 52 Stat. 1060, 1061; 29 U.S.C. § 204, promulgated the regulations codified at 29 C.F.R. § 782, the regulations on which the district court and the majority here rely. 13 Fed.Reg. 2346 (codified at 29 C.F.R. § 782 (1949)). The DOL’s regulations have been amended only slightly over the years, so they are today almost identical to their original enactment in 1948. Compare 29 C.F.R. § 782 (current), with 13 Fed.Reg. 2346 (1948).
The DOL’s regulations state their purpose on their face: they reflect “the construction of the law [regarding the MCA exemption] which the [DOL] believes to be correct in the light of the decisions of the courts and the Interstate Commerce Commission.” Id. And indeed, the DOL’s regulations do nothing more than describe the jurisprudential principles that followed from the above-discussed ICC jurisdictional pronouncements and case law, primarily the Supreme Court’s 1947 trilogy.
29 C.F.R. § 782.2 says: “The [MCA exemption] depends both on the class to *303 which his employer belongs and on the class of work involved in the employee’s job.” It continues:
The power of the Secretary of Transportation [previously “Interstate Commerce Commission”] to establish maximum hours and qualifications of service of employees, on which exemption depends, extends to those classes of employees and those only who (1) are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his [previously “the Commission’s”] jurisdiction under section 204 of the Motor Carrier Act and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.
§ 782.2. The regulations proceed to discuss the “classes of employees” that the ICC had determined fall under MCA jurisdiction: “drivers” (§ 782.3 (citing Ex parte No. MC-2; Ex parte No. MC-3; Ex Parte No. MC-4)), “drivers’ helpers” (§ 782.4 (citing Ex Parte No. MC-2)), “loaders” (§ 782.5 (citing Ex parte No. MC-2)), and “mechanics” (§ 782.6 (citing Ex parte No. MC-2)).
Over a decade later, in 1966, the DOT was created and authority to enforce the MCA was transferred to it from the ICC. Department of Transportation Act, § 6(e), 80 Stat. 931, 939.
In 1971, the DOL revised its § 782 regulations to recognize the transfer of MCA authority from the ICC to the DOT. 36 Fed.Reg. 21778. Aside from acknowledging the transfer of authority, the regulations were substantially untouched. Since that 1971 revision, the DOL has never again revised the § 782 regulations.
As for the DOT, since 1966, when it was created and given authority to enforce the MCA, it has never issued regulations on the maximum scope of its jurisdiction over qualifications and maximum hours of service as had the ICC decades before.[21] Thus, although the ICC lost its MCA authority in 1966, its 1930s and 1940s regulations still represent the most recent expression of the official agency view of the scope of MCA jurisdiction.
In 1995, the ICC was eliminated entirely. ICC Termination Act, § 101, 109 Stat. 803 (“The Interstate Commerce Commission is abolished.”).
That brings us to today.
C.
This history makes several things clear. First, the phrase “classes of employees” in the DOL’s regulations, on which the district court and the majority here cite in support of their novel analysis, references the four categories of job activities that the ICC decades ago concluded affect the safety of interstate motor vehicle transportation: “drivers,” “drivers’ helpers,” “loaders,” and “mechanics.” When § 782 says that the MCA exemption “depends on” “the class of work involved in the employee’s job” and extends only to certain “classes of employees,” what § 782 means is simply that the court, in deference to the ICC’s findings of fact, should determine whether the employee’s job duties are such that the employee falls under the *304 ICC’s definition of a “driver,” “driver’s helper,” “loader,” or “mechanic.” Put another way, the only “class” inquiry contemplated by § 782 is, the court must determine what activities the employee’s job entails and whether those activities are such that the employee fits into the ICC’s definition of a “driver,” “driver’s helper,” “loader,” or “mechanic.”[22]
Here, there is no question that some of the employees drive motor vehicles and, hence, are within the ICC’s definition of the “drivers” “class” if and when they drive interstate. That question, whether the driver-employees at issue in this case are reasonably likely to drive interstate, should be resolved in the ordinary manner, by examining the relevant evidence, drawing reasonable inferences, etc. — in other words, through the “judicial process.” Pyramid Motor Freight Corp., 330 U.S. at 707, 67 S.Ct. 954. In reading § 782’s reference to “classes of employees” as calling for courts to define their own “groups” or “classes” of employees and to determine MCA jurisdiction vel non with respect to such judicially defined “groups” or “classes,” the district court and majority have committed clear error.
Second, it is clear that, until today, in the history of FLSA-and-MCA-exemption litigation, the courts have never defined their own “groups” or “classes” of employees to determine MCA jurisdiction on that basis, as the district court and majority have done here. In Pyramid Motor Freight Corp., and reaffirmed later that same year in Morris, the Supreme Court clearly required individual analysis of “each” employee’s actual job duties. The district court’s and majority’s “company-wide,” “group”- or “class”-based analysis, which determines MCA jurisdiction based on the activities of a “group” or “class” of employees that the court has defined itself, is in clear conflict. See Pyramid Motor Freight Corp., 330 U.S. at 698, 708, 67 S.Ct. 954 (the district court must “determine whether or not the activities of each [employee]” “affect[ ] the safety of operation of motor vehicles in interstate or foreign commerce,” and the district court may deny overtime pay only to “those [employees] who are engaged in such activities”); Morris, 332 U.S. at 430, 68 S.Ct. 131 (observing that, “if this were an action to recover overtime compensation for individual employees, it would be necessary to determine” “the extent to which [the employees] devoted themselves to [work affecting transportation safety]”). And, the district court’s and majority’s analysis conflicts with the prior decisions of this court requiring individual analysis. Compare ante, at 284 (adopting “company-wide” analysis and stating that “this court’s precedent effectively forecloses an employee-by-employee analysis”), with Mitchell, 286 F.2d at 114 (holding that “it is the activities of the particular employee, rather than the employer, which determine coverage”), and Opelika Royal Crown Bottling Co., 299 F.2d at 42-43 (applying individual analysis). Finally, the majority’s opinion creates a split with the decisions of at least three of our sister circuits. See Harshman, 248 F.Supp. at 958, aff'd, 355 F.2d *305 206; Troutt, 107 F.3d at 1107-10; Goldberg, 291 F.2d at 234-35.
This case involves workers in Texas and Louisiana, and the question is whether they are reasonably likely to drive interstate. To answer that question, the court must examine evidence that is relevant to the work of those employees. There is no legal reason the court may point to other employees in Wyoming who are very likely to drive interstate and declare that, as a result of some legal fiction, the same is true of the Texas and Louisiana workers, even if belied by the evidence. The district court’s and majority’s creation of a “company-wide,” “group”- or “class”-based mode of analysis that does just that is in clear conflict with the Supreme Court’s mandate that we “determine whether or not the activities of each [employee]” “affect[] the safety of operation of motor vehicles in interstate or foreign commerce” and deny overtime pay only to “those [employees] who are engaged in such activities.” Pyramid Motor Freight Corp., 330 U.S. at 698, 708, 67 S.Ct. 954.
III. The Proper Analysis
To decide whether the employees here are reasonably likely to drive interstate, rather than merely intrastate, the district court and this court should simply look at the evidence and make a determination vel non for each plaintiff-employee. We should look to the testimony about the realities of the job as well as any documentary records. The employee’s job description, if the company has issued one, is relevant too, although not dispositive, since it may not reflect the realities of the job. Pyramid Motor Freight Corp., 330 U.S. at 707, 67 S.Ct. 954 (the district court “shall not be concluded by the name which may have been given to [the employee’s] position or to the work that he does”); Ale v. Tenn. Valley Auth., 269 F.3d 680, 688-89 (6th Cir.2001) (“[C]ourts must focus on the actual activities of the employee in order to determine whether or not he is exempt from the FLSA’s overtime regulations.”) (emphasis added).
As discussed above, Coil Tubing Services divides its operations into six districts, and the employees at issue here were stationed in four of the six: the Alice, Angleton, and Bridgeport districts in Texas and the Broussard district in Louisiana. The company generally assigns well-servicing jobs to the geographically closest district, and the employees in that district are required to handle the job. If the equipment and personnel needed for a job are not available in the district to which it is assigned, the district can borrow workers and equipment from another district, but, according to the evidence in the record, such instances of inter-district borrowing are “rare” and “exceptional.”
Record evidence shows that the vast majority of jobs handled by the Alice, An-gleton, Bridgeport, and Broussard districts were purely intrastate jobs — that is, Texas-based workers worked in Texas and Louisiana — based workers worked in Louisiana — and only a tiny number of jobs required crossing state borders. In Alice and Bridgeport, less than one percent of the jobs handled by those districts during the period recorded were interstate. In Angleton, less than two percent of the jobs were interstate. And, in Broussard, around five percent of the jobs were interstate. Moreover, these figures likely over-represent the actual-likelihood of any given employee driving interstate because, when traveling to the jobsite, only one employee would have to drive each vehicle, and others would ride as passengers. Thus, while there was less than a one percent chance— about 0.33% of a chance, the evidence shows — that any given job in the Alice district would involve, interstate transportation, there was even less than a 0.33% *306 chance of any given Alice worker driving interstate for any given job assigned to the district. Inversely, when a worker in the Alice district was given a job that was assigned to that district, there was a greater than 99% chance that the worker would not drive interstate. .
The record contains employee testimony that tends to corroborate the unlikelihood of driving interstate or, indeed, driving at all. For example, one employee in the Alice district, Jesus Hernandez, testified that, in his five years working there, he only drove interstate once. An employee in the Angleton district, Cody Patín, testified that, during his half year working there, he only drove a motor vehicle a single time, when he drove “a supervisor’s truck to go get lunch for everybody one day.” There is similar testimony from a number of other employees in the record.
Based on this evidence, a reasonable factfinder could determine that the likelihood of these field service employees in the Alice, Angleton, Bridgeport, and Broussard districts driving interstate is so minimal and remote, they cannot be “reasonably expected” to be “called upon in the ordinary course of [their] work to [drive interstate].” Songer, 618 F.3d at 474; see Coleman, 324 F.Supp. at 670; Kimball, 504 F.Supp. at 548; Yaklin, No. 07-CV-422, 2008 WL 4692419, at *6. Accordingly, there is a genuine dispute of material fact as to the reasonable likelihood of these employees driving interstate.
Regarding the fact that Coil Tubing Services’s employees in Wyoming drive interstate very often, there is no factual indication in the record why that is relevant to the Texas and Louisiana employees. True, there is evidence that on “rare” and “exceptional” occasions, one district can borrow another district’s employees for a job if needed. But, again, according to the record evidence, such instances are unusual, and, importantly, there is no indication in the record that an employee has ever been sent from Texas or Louisiana to Wyoming. Thus, a reasonable factfinder could determine that there is simply no reasonable likelihood of a Texas or Louisiana employee being dispatched to participate in a Wyoming job. Contrary to the district court’s and the majority’s suggestions, this is not a case like Songer in which all employees accept their job assignments from a single dispatch. See 618 F.3d at 470. In terms of the work that the employees here could be expected to carry out, the record evidence shows material differences between the assignments given to the Wyoming employees and the Texas and Louisiana employees at issue in this case.
The evidence in the record reveals a genuine dispute of material fact as to whether the employees here were reasonably likely to be called upon to drive interstate in the course of their work for Coil Tubing Services. Accordingly, the district court’s grant of summary judgment for the company and against the employees on their FLSA claims was improper and should be reversed.
IV. Conclusion
The plaintiffs-employees at issue in this case work in Texas and Louisiana. The evidence shows that they are, as a matter of fact, extremely unlikely to be called upon to drive interstate in the course of their work. Nevertheless, the district court and majority point to other employees in Wyoming who are not parties to this litigation but who are likely to drive interstate and, by dint of the legal fiction of “group” or “class” membership, say that the Texas and Louisiana workers are no different — that is, they too are likely to drive interstate, despite the evidence showing the precise opposite. The district court and the majority cite the DOL’s regulations and Songer as support for their decisions, but they have unfortunate *307 ly misread and misapplied these sources of law, neither of which support the “group”- or “class”-based analysis that was applied here on a “company-wide basis” to except more than a hundred employees from overtime wages. The law requires, and has always required, individual analysis of each employee’s actual job circumstances. It has never been permissible for courts to disregard the actual evidence in favor of legal fictions in which broad swathes of employees are swept together so as to exempt from overtime wages great numbers of employees based on the activities of others. Simply stated, the district court must “determine whether or not the activities of each [employee]” are reasonably likely to affect the safety of interstate transportation. Pyramid Motor Freight Corp., 330 U.S. at 707-08, 67 S.Ct. 954 (emphasis added). The evidence shows that the plaintiffs, employees in Texas and Louisiana, are extremely unlikely to drive interstate. The law does not allow us to exempt them from overtime pay based on the job activities of other workers in Wyoming who are not a part of this case. I respectfully dissent.

. As further explained below, for an employee to be "engaged in” activities that affect the safety of interstate transportation means that "the employee’s job duties are such that he is (or is likely to be) called upon in the ordinary course of his work to perform safety-affecting activities.” E.g., Songer, 618 F.3d at 474 (quoting 29 C.F.R. § 782.2(b)(3)) (alteration omitted, emphasis added).

. I note in the interest of clarity that this case is not a class action. See Fed.R.Civ.P. 23 (class action rules). The distinct "class” concept the majority creates today is unique to the MCA exemption to the FLSA and is unrelated to class actions under Rule 23.

. The majority characterizes the differences in our analysis as a "minimal semantic gap." Ante, at 288 n. 8. Respectfully, it appears that the majority has, with the best of intentions, mistakenly elided the diverge in our views. It is uncontroversial and I of course agree that, when particular evidence is factually common to multiple employees, such evidence is indeed relevant to the individual job circumstances of multiple employees. E.g., if an employer applies a particular company policy to all of its employees, then such policy obviously illuminates the individual job circumstances of each employee. Such analysis, however, is not what the district court here did. As further explained below, the district court recognized that the evidence regarding the job circumstances of the Wyoming employees differed materially from the evidence regarding the job circumstances of the Texas and Louisiana employees. Looking at statistical evidence, the district court concluded that the Wyoming employees were very likely to carry out job activities affecting the safety of interstate transportation. And, looking at other statistical evidence, the district court further concluded that many of the Texas and Louisiana employees were very unlikely to do such. Despite the factual differences, however, the district court ruled that, as a matter of law, the likelihood of the Wyoming employees affecting interstate transportation safety should be imputed to the Texas and Louisiana employees. The difference between the majority’s analysis and my own is not a semantic question as to how to refer to evidence that is factually common to multiple employees. The difference is a substantive one, viz., whether courts are permitted under the MCA exemption to use a "group”- or "class”-based analysis (or however else it may be called) that imputes "facts,” as a matter of legal fiction, to an employee when such "facts” are belied by the evidence.

. The FLSA’s protection over overtime wages reaches only those employees who are "engaged in commerce or the production of goods for commerce,” and "commerce” “means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.” 29 U.S.C. §§ 207(a)(1), 203(b). Here, it is undisputed that the employees at issue in this case are "engaged in commerce” within the meaning of the FLSA. The disputed issue is rather whether the FLSA's protection over overtime wages does not apply to the employees because the DOT "has power to establish qualifications and maximum hours of service [of them] pursuant to the provisions of section 31502 of Title 49.” Id. § 213(b)(1).

. It is well settled that the MCA exemption turns on whether the DOT has power — i.e., legal jurisdiction — to regulate the worker's qualifications and maximum hours of service under the MCA, not whether the DOT has actually exercised its power to do so. Southland Gasoline Co. v. Bayley, 319 U.S. 44, 47-48, 63 S.Ct. 917, 87 L.Ed. 1244 (1943); Songer, 618 F.3d at 472.

. Although the scope of the MCA exemption to the FLSA and the scope of the DOT's regulatory jurisdiction are generally one and the same, there may be an exception to that rule following passage of the SAFETEA-LU Technical Corrections Act of 2008, Pub.L. 110-244, 122 Stat. 1572, which, in part, provides generally that, from the date of the act's enactment, June 6, 2008, the MCA exemption does not apply to employees who would otherwise fall within its ambit if the following requirements are met:
(1) [the employee] is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);
(2) [the employee’s] work, in whole or in part, is defined—
(A) as that of a driver, driver’s helper, loader, or mechanic; and
(B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, except vehicles—
(i) designed or used to transport more than 8 passengers (including the driver) for compensation;
(ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or
(iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States Code; and (3) [the employee] performs duties on motor vehicles weighing 10,000 pounds or less.
Id. § 306(a), (c). For a discussion of the SAFETEA-LU Technical Corrections Act, see, e.g., McCall v. Disabled Am. Veterans, 723 F.3d 962 (8th Cir.2013). This interlocutory appeal does not address the district court’s resolution of the plaintiffs’ post-June 6, 2008, claims to which the SAFETEA-LU Technical Corrections Act applies, but rather only the district court's resolution of the pre-June 6, 2008, claims, and therefore, the act is not implicated here.

. Section 31502(b) provides:
The Secretary of Transportation may prescribe requirements for—
(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and
(2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.

. “The term 'motor private carrier’ means a person, other than a motor carrier, transporting property by motor vehicle when (A) the transportation is as provided in section 13501 of this title [see infra, note 10]; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.” Id. § 13102(15).

. The DOT has created a “four-month rule” under which "[ejvidence of driving in interstate commerce or being subject to being used in interstate commerce” is "proof” that the driver falls under MCA jurisdiction "for a 4-month period from the date of the proof.” 46 Fed.Reg. 37902.

.Section 31502(a) provides, "This section applies to transportation — (1) described in sections 13501 and 13502 of this title; and (2) to the extent the transportation is in the United States and is between places in a foreign country, or between a place in a foreign country and a place in another foreign country.”
Section 13501 provides:
The Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier—
(1) between a place in—
(A) a State and a place in another State;
(B) a State and another place in the same State through another State;
*293 (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
(D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
(E) the United States and a place in a foreign country to the extent the transportation is in the United States; and
(2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.
Under our case law, § 13501 also impliedly includes within its ambit "the intrastate transport of goods in the flow of interstate commerce.” Songer, 618 F.3d at 472; Shew v. Southland Corp., 370 F.2d 376, 380-81 (5th Cir.1966).
Section 13502 relates to Alaska and is irrelevant here.

. There is no contention in this case that Coil Tubing Services employees work internationally or transport goods in the flow of interstate commerce. Thus, the only question here is whether an employee's actual job activities affect interstate transportation safety.

. The district court's first summary-judgment ruling has not been published but it is included in the record on appeal. See R. 7233-97.

. As an initial matter, the district court should have recognized that the DOL does not have authority to define the scope of MCA jurisdiction, as the DOL’s regulations acknowledge. 29 C.F.R. § 782.1(a) (“The Fair Labor Standards Act confers no authority on the Secretary of Labor or the Administrator to extend or restrict the scope of this exemption.”). Accordingly, the DOL's views on the scope of MCA jurisdiction are not entitled to deference from the courts. Levinson v. Spector Motor Serv., 330 U.S. 649, 676-77, 67 S.Ct. 931, 91 L.Ed. 1158 (1947); Packard v. Pittsburgh Transp. Co., 418 F.3d 246, 251 n. 5 (3d Cir.2005); Troutt v. Stavola Bros., Inc., 107 F.3d 1104, 1108 n. 1 (4th Cir.1997); Benson v. Universal Ambulance Serv., Inc., 675 F.2d 783, 785 (6th Cir.1982); Johnson v. Hix Wrecker Serv., Inc., 651 F.3d 658, 661 n. 1 (7th Cir.2011). But see Baez v. Wells Fargo Armored Serv. Corp., 938 F.2d 180, 182 n. 4 (11th Cir.1991).

. The district court's grant of summary judgment for Coil Tubing Services was partial. The district court ruled in favor of some of the plaintiffs in certain regards that were not appealed and, thus, are not at issue now.

. The majority says that the "parties do not contest that an individualized analysis is appropriate to determine whether Appellants have similar-enough duties to belong to the class of employees that engages in safety-affecting activities.” Ante, at 284. This statement about what the parties "do not contest” misrepresents the employees’ position. The' employees indeed challenge the conclusion that they should be categorized and analyzed as "a class of employees” with "similar-enough duties.” They contend that the requisite MCA analysis encompasses no judicial sorting of employees into categories at all. See Appellants' Br. 17 ("[T]he MCA is analyzed on an individual basis.... No meaningful authority, however, supports the whole company analysis proposed by CTS. Thus, the district court erred by adopting a modified version of it.”), 24 ("[A]n individual analysis is required to determine the character and timing of the employee’s duties, and therefore the application of the exception.”).

. Shortly after the ICC’s decision in Ex parte No. MC-28 issued, a number of companies challenged the agency’s conclusion that its jurisdiction reaches only those employees whose activities affect the safety of operation, but the ICC reaffirmed its initial decision. No. MC-C-189, 16 M.C.C. 497 (1939). The issue was brought to the Supreme Court, and, in 1940, the Court agreed with the ICC that the agency’s jurisdiction "is limited to those employees whose activities affect the safety of operation” and it “has no jurisdiction to regulate the qualifications or hours of service of any others.” Am. Tiucking Ass'ns, 310 U.S. at 553, 60 S.Ct. 1059.

. The ICC’s opinion termed its determinations as to whether the work activities at issue affect safety "findings of fact” and the corresponding jurisdictional decisions "conclusions of law.” Id. at 138-39.

. The principal issue in Levinson was whether the ICC has jurisdiction over a “partial-duty loader” — that is, a worker who spent a "substantial part” of his working hours doing the activities that the ICC, in Ex parte No. MC-2, described as the duties of “loaders” (i.e., loading and unloading motor vehicles and transferring freight) and the rest of his time doing other activities that did not have an effect on the safety of motor vehicle transportation operations. Id. at 651-52. The Court answered that question in the affirmative, holding that the ICC has jurisdiction over workers who spend a "substantial” amount of their time doing the work of loaders. Id. at 685.

. The Court also held that the mechanics who work on the vehicles that spend approximately four percent of their time in interstate commerce trips fall under the MCA. Id. at 432 ("What is thus true for the driver is true also for the mechanic who repairs his truck.”).

. After the district court made its findings on remand in Mitchell, the case was again appealed to this court sub nom., Wirtz v. C & P Shoe Corp., 336 F.2d 21 (5th Cir.1964).

. In 1981, the DOT did, however, issue a "notice of interpretation” regarding its jurisdiction over certain drivers. 46 Fed.Reg. 37902. But that notice of interpretation did not purport to speak as to the maximum scope of the agency’s jurisdiction in other respects. Id. at 37903 ("This interpretation relates solely to the jurisdiction over drivers.”).

. It could be contended that, since the ICC's authority under the MCA was transferred to the DOT in 1966 (and the ICC was abolished entirely in 1995), courts ought to determine de novo whether job activities affect the safety of motor vehicle transportation rather than deferring to the antiquated ICC findings. But that question should be left for another day. Here, we deal only with driving motor vehicles, and, regardless of what the ICC has said on the topic, "[i]t is obvious that one who drives a vehicle in interstate commerce directly affects the safety of such operations as long as he is driving.” Crooker, 469 F.2d at 209.